# WALTON v. ARIZONA

No. 88–7351.   Argued January 17, 1990—Decided June 27, 1990

640

WHITE, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and V, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Parts III and IV, in which REHNQUIST, C. J., and O'CONNOR, and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 656. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 674. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 677. STEVENS, J., filed a dissenting opinion, *post*, p. 708.

*Timothy K. Ford* argued the cause for petitioner. With him on the briefs was *Denise I. Young.*

*Paul J. McMurdie*, Assistant Attorney General of Arizona, argued the cause for respondent. With him on the

brief were *Robert K. Corbin*, Attorney General, and *Jessica Gifford Funkhouser*.*

JUSTICE WHITE announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and V, and an opinion with respect to Parts III and IV, in which THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE KENNEDY joined.

At issue in this case is the validity of the death sentence imposed by an Arizona trial court after a jury found petitioner Jeffrey Walton guilty of committing first-degree murder.

The Arizona statutes provide that a person commits first-degree murder if "[i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation" or if in the course of committing certain specified offenses and without any mental state other than what is required for the commission of such offenses, he causes the death of any person. Ariz. Rev. Stat. Ann.

---

*John A. Powell, Michael Laurence, Welsh S. White,* and *Randy Hertz* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

A brief of *amici curiae* urging affirmance was filed for the Commonwealth of Pennsylvania et al. by *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Robert A. Graci,* Chief Deputy Attorney General, and *Mary Benefield Seiverling,* Deputy Attorney General, *John J. Kelly,* Chief State's Attorney of Connecticut, *Robert Butterworth,* Attorney General of Florida, *James T. Jones,* Attorney General of Idaho, *Neil F. Hartigan,* Attorney General of Illinois, *Robert T. Stephan,* Attorney General of Kansas, *Frederic J. Cowan,* Attorney General of Kentucky, *Michael C. Moore,* Attorney General of Mississippi, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *Brian McKay,* Attorney General of Nevada, *John P. Arnold,* Attorney General of New Hampshire, *Hal Stratton,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *Robert H. Henry,* Attorney General of Oklahoma, *Roger A. Tellinghuisen,* Attorney General of South Dakota, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Joseph B. Meyer,* Attorney General of Wyoming.

§ 13–1105 (1989). After a person has been found guilty of first-degree murder, the sentence for such crime is determined in accordance with the provisions of § 13–703(B). It is there directed that a "separate sentencing hearing . . . shall be conducted before the court alone" to determine whether the sentence shall be death or life imprisonment. In the course of such hearing, the judge is instructed to determine the existence or nonexistence of any of the aggravating or mitigating circumstances defined in subsections (F) and (G) of § 13–703. Subsection (F) defines 10 aggravating circumstances that may be considered. One of them is whether the offense was committed with the expectation of receiving anything of pecuniary value. § 13–703(F)(5). Another is whether the defendant committed the offense in an especially heinous, cruel, or depraved manner. § 13–703(F)(6). Subsection (G) defines mitigating circumstances as any factors "which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to" five specified factors.[1] The burden of establishing the existence of any of the aggravating circumstances is on the prosecution, while the burden of establishing mitigating circumstances is

---

[1] Those factors are as follows:

"1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

"2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.

"3. The defendant was legally accountable for the conduct of another under the provisions of § 13–303, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

"4. The defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person.

"5. The defendant's age." Ariz. Rev. Stat. Ann. § 13–703(G) (1989).

on the defendant. § 13–703(C). The court is directed to return a special verdict setting forth its findings as to aggravating and mitigating circumstances and then "shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection (F) of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency." § 13–703(E).

## I

Petitioner Walton and his two codefendants, Robert Hoover and Sharold Ramsey, went to a bar in Tucson, Arizona, on the night of March 2, 1986, intending to find and rob someone at random, steal his car, tie him up, and leave him in the desert while they fled the State in the car. In the bar's parking lot, the trio encountered Thomas Powell, a young, off-duty Marine. The three robbed Powell at gunpoint and forced him into his car which they then drove out into the desert. While driving out of Tucson, the three asked Powell questions about where he lived and whether he had any more money. When the car stopped, Ramsey told a frightened Powell that he would not be hurt. Walton and Hoover then forced Powell out of the car and had him lie face down on the ground near the car while they debated what to do with him. Eventually, Walton instructed Hoover and Ramsey to sit in the car and turn the radio up loud. Walton then took a .22 caliber derringer and marched Powell off into the desert. After walking a short distance, Walton forced Powell to lie down on the ground, placed his foot on Powell's neck, and shot Powell once in the head. Walton later told Hoover and Ramsey that he had shot Powell and that he had "never seen a man pee in his pants before." Powell's body was found approximately a week later, after Walton was arrested and led police to the murder site. A medical examiner determined that Powell had been blinded and rendered unconscious by the shot but was not immediately killed. Instead, Powell regained consciousness, apparently floundered about in the

desert, and ultimately died from dehydration, starvation, and pneumonia approximately a day before his body was found.

A jury convicted Walton of first-degree murder after being given instructions on both premeditated and felony murder. See Ariz. Rev. Stat. Ann. § 13–1105 (1989). The trial judge then conducted the separate sentencing hearing required by § 13–703(B). The State argued that two aggravating circumstances were present: (1) The murder was committed "in an especially heinous, cruel or depraved manner," § 13–703(F)(6), and (2) the murder was committed for pecuniary gain. § 13–703(F)(5). In mitigation Walton presented testimony from a psychiatrist who opined that Walton had a long history of substance abuse which impaired his judgment, see § 13–703(G)(1), and that Walton may have been abused sexually as a child. Walton's counsel also argued Walton's age, 20 at the time of sentencing, as a mitigating circumstance. See § 13–703(G)(5). At the conclusion of the hearing, the trial court found "beyond any doubt" that Walton was the one who shot Powell. The court also found that the two aggravating circumstances pressed by the State were present. The court stated that it had considered Walton's age and his capacity to appreciate the wrongfulness of his conduct, as well as all of the mitigating factors urged by defendant's counsel. The court then concluded that that there were "no mitigating circumstances sufficiently substantial to call for leniency." App. 61. See § 13–703. The court sentenced Walton to death.

The Arizona Supreme Court affirmed Walton's conviction and sentence. 159 Ariz. 571, 769 P. 2d 1017 (1989). Relying on its prior decisions, the court rejected various specific challenges to the constitutionality of the Arizona death penalty statute, some of which are pressed here, and then proceeded to conduct its independent review of Walton's sentence in order to "ensure that aggravating factors were proven beyond a reasonable doubt and all appropriate mitigation was

considered." *Id.*, at 586, 769 P. 2d, at 1032.[2]    The court began by examining the "especially heinous, cruel or depraved" aggravating circumstance found by the trial judge. The court pointed out that it previously had determined that a murder is committed in an especially cruel manner when "the perpetrator inflicts mental anguish or physical abuse before the victim's death," *id.*, at 586, 769 P. 2d, at 1032, (citations omitted), and that "[m]ental anguish includes a victim's uncertainty as to his ultimate fate." *Ibid.*   In this case, the court concluded that there was ample evidence that Powell suffered mental anguish prior to his death.[3]    The Arizona Supreme Court also found the evidence sufficient to conclude that the crime was committed in an especially depraved manner, pointing out that it had defined a depraved murder as one where "the perpetrator relishes the murder, evidencing debasement or perversion." *Id.*, at 587, 769 P. 2d, at 1033.[4]

---

[2] In the course of its opinion, the court also rejected Walton's challenge, not repeated in this Court, that Hoover and not Walton actually shot Powell.   The court pointed out that because the jury was instructed on both felony and premeditated murder but entered only a general verdict, the trial court was required under Arizona law to independently make the determination mandated by *Enmund* v. *Florida*, 458 U. S. 782 (1982), and *Tison* v. *Arizona*, 481 U. S. 137 (1987), that Walton killed, intended to kill, attempted to kill, or as a participant in a felony was recklessly indifferent to the killing of Powell.   159 Ariz., at 585, 769 P. 2d, at 1031.   The court then held that the trial court's *Enmund* determination was based on substantial evidence.   159 Ariz., at 586, 769 P. 2d, at 1032.

[3] The court argued that Powell must have realized as he was being driven out of Tucson into the desert that he might be harmed, and the court pointed out that Powell was obviously frightened enough that Ramsey tried to reassure him that he would not be harmed.   Then, the court noted, Walton and Hoover forced Powell to lie on the ground while they argued over his fate, and eventually Walton marched Powell off into the desert with a gun but no rope, surely making Powell realize that he was not going to be tied up and left unharmed.   The court further observed that Powell was so frightened that he urinated on himself.   *Id.*, at 586–587, 769 P. 2d, at 1032–1033.

[4] The court concluded that Walton's reference to having " 'never seen a man pee in his pants before' " constituted evidence of "callous fascination

Additionally, the court found that the pecuniary gain circumstance was present. *Id.*, at 588, 769 P. 2d, at 1034. After examining Walton's mitigating evidence regarding his substance abuse and his youth, the court concluded that there were "no mitigating circumstances sufficient to call for lenience." *Id.*, at 589, 769 P. 2d, at 1035. Finally, the court conducted its proportionality review and determined that Walton's death sentence was "proportional to sentences imposed in similar cases." *Id.*, at 590, 769 P. 2d, at 1036.

Because the United States Court of Appeals for the Ninth Circuit has held the Arizona death penalty statute to be unconstitutional for the reasons submitted by Walton in this case, see *Adamson* v. *Ricketts*, 865 F. 2d 1011 (1988) (en banc), we granted certiorari, 493 U. S. 808 (1989), to resolve the conflict and to settle issues that are of importance generally in the administration of the death penalty. We now affirm the judgment of the Arizona Supreme Court.

## II

Walton's first argument is that every finding of fact underlying the sentencing decision must be made by a jury, not by a judge, and that the Arizona scheme would be constitutional only if a jury decides what aggravating and mitigating circumstances are present in a given case and the trial judge then imposes sentence based on those findings. Contrary to Walton's assertion, however: "Any argument that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." *Clemons* v. *Mississippi*, 494 U. S. 738, 745 (1990).

We repeatedly have rejected constitutional challenges to Florida's death sentencing scheme, which provides for sentencing by the judge, not the jury. *Hildwin* v. *Florida*, 490

with the murder" and demonstrated "an indifference to the suffering of the victim and . . . a sense of pleasure" taken "in the killing." *Id.*, at 587, 769 P. 2d, at 1033.

U. S. 638 (1989) *(per curiam); Spaziano* v. *Florida,* 468 U. S. 447 (1984); *Proffitt* v. *Florida,* 428 U. S. 242 (1976). In *Hildwin,* for example, we stated that "[t]his case presents us once again with the question whether the Sixth Amendment requires a jury to specify the aggravating factors that permit the imposition of capital punishment in Florida," 490 U. S., at 638, and we ultimately concluded that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." *Id.,* at 640–641.

The distinctions Walton attempts to draw between the Florida and Arizona statutory schemes are not persuasive. It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona.

Walton also suggests that in Florida aggravating factors are only sentencing "considerations" while in Arizona they are "elements of the offense." But as we observed in *Poland* v. *Arizona,* 476 U. S. 147 (1986), an Arizona capital punishment case: "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (*i. e.,* require the death penalty), and the failure to find any particular aggravating circumstance does not 'acquit' a defendant (*i. e.,* preclude the death penalty)." *Id.,* at 156 (citation omitted).

Our holding in *Cabana* v. *Bullock,* 474 U. S. 376 (1986), provides further support for our conclusion. *Cabana* held that an appellate court could constitutionally make the *Enmund* v. *Florida,* 458 U. S. 782 (1982), finding—that the

defendant killed, attempted to kill, or intended to kill—in the first instance. We noted that "*Enmund*, 'does not affect the state's definition of any substantive offense, even a capital offense,'" 474 U. S., at 385 (citations omitted), and that "while the Eighth Amendment prohibits the execution of such defendants, it does not supply a new element of the crime of capital murder that must be found by the jury." *Id.*, at 385, n. 3. *Enmund* only places "a substantive limitation on sentencing, and like other such limits it need not be enforced by the jury." 474 U. S., at 386. If the Constitution does not require that the *Enmund* finding be proved as an element of the offense of capital murder, and does not require a jury to make that finding, we cannot conclude that a State is required to denominate aggravating circumstances "elements" of the offense or permit only a jury to determine the existence of such circumstances.

We thus conclude that the Arizona capital sentencing scheme does not violate the Sixth Amendment.

### III

Also unpersuasive is Walton's contention that the Arizona statute violates the Eighth and Fourteenth Amendments because it imposes on defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency. See Ariz. Rev. Stat. Ann. §§ 13–703(C) and 13–703(E) (1989). It is true that the Court has refused to countenance state-imposed restrictions on what mitigating circumstances may be considered in deciding whether to impose the death penalty. See, *e. g.*, *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion). But Walton is not complaining that the Arizona statute or practice excludes from consideration any particular type of mitigating evidence; and it does not follow from *Lockett* and its progeny that a State is precluded from specifying how mitigating circumstances are to be proved. Indeed, in *Lockett* itself, we expressly reserved opinion on

whether "it violates the Constitution to require defendants to bear the risk of nonpersuasion as to the existence of mitigating circumstances in capital cases." *Id.*, at 609, and n. 16 (plurality opinion).

In *Martin* v. *Ohio*, 480 U. S. 228 (1987), we upheld the Ohio practice of imposing on a capital defendant the burden of proving by a preponderance of the evidence that she was acting in self-defense when she allegedly committed the murder. In *Leland* v. *Oregon*, 343 U. S. 790 (1952), the Court upheld, in a capital case, a requirement that the defense of insanity be proved beyond a reasonable doubt by the defendant, see also *Rivera* v. *Delaware*, 429 U. S. 877 (1976), and in *Patterson* v. *New York*, 432 U. S. 197 (1977), we rejected the argument that a State violated due process by imposing a preponderance of the evidence standard on a defendant to prove the affirmative defense of extreme emotional disturbance.

The basic principle of these cases controls the result in this case. So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency. *Mullaney* v. *Wilbur*, 421 U. S. 684 (1975), is not to the contrary. *Mullaney* struck down on due process grounds a state statute that required a convicted murder defendant to negate an element of the offense of murder in order to be entitled to a sentence for voluntary manslaughter. No such burden is placed on defendants by Arizona's capital sentencing scheme. We therefore decline to adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated them by a preponderance of the evidence.

Neither does *Mills* v. *Maryland*, 486 U. S. 367 (1988), lend support to Walton's position. There this Court reversed a

death sentence because it concluded that the jury instructions given at the sentencing phase likely led the jury to believe that any particular mitigating circumstance could not be considered unless the jurors unanimously agreed that such circumstance was present. The Court's focus was on whether reasonable jurors would have read the instructions to require unanimity and, if so, the possible consequences of such an understanding. Here, of course, the judge alone is the sentencer, and *Mills* is therefore beside the point.

Furthermore, *Mills* did not suggest that it would be forbidden to require each individual juror, before weighing a claimed mitigating circumstance in the balance, to be convinced in his or her own mind that the mitigating circumstance has been proved by a preponderance of the evidence. To the contrary, the jury in that case was instructed that it had to find that any mitigating circumstances had been proved by a preponderance of the evidence. *Id.*, at 387. Neither the petitioner in *Mills* nor the Court in its opinion hinted that there was any constitutional objection to that aspect of the instructions.

We therefore reject Walton's argument that Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution.

## IV

Walton insists that because § 13–703(E) provides that the court "shall" impose the death penalty if one or more aggravating circumstances are found and mitigating circumstances are held insufficient to call for leniency, the statute creates an unconstitutional presumption that death is the proper sentence. Our recent decisions in *Blystone v. Pennsylvania*, 494 U. S. 299 (1990), and *Boyde v. California*, 494 U. S. 370 (1990), foreclose this submission. *Blystone* rejected a challenge to a jury instruction based on a Pennsylvania statute requiring the imposition of the death penalty if aggravating circumstances were found to exist but no miti-

gating circumstances were present. We pointed out that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence," 494 U. S., at 307 (footnote omitted), and concluded that because the Pennsylvania statute did not preclude the sentencer from considering any type of mitigating evidence, *id.*, at 308, it was consonant with that principle. In addition, the Court concluded that the statute was not "impermissibly 'mandatory' as that term was understood" in *Woodson v. North Carolina*, 428 U. S. 280 (1976), and *Roberts v. Louisiana*, 428 U. S. 325 (1976), because it did not automatically impose death upon conviction for certain types of murder. 494 U. S., at 305. The same is true of the Arizona statute.

Similarly, *Boyde v. California, supra,* upheld a pattern jury instruction which stated that "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." See 494 U. S., at 374 (emphasis omitted). The Court specifically noted that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Id.*, at 377 (quoting *Franklin v. Lynaugh*, 487 U. S. 164, 181 (1988) (plurality opinion)). Walton's arguments in this case are no more persuasive than those made in *Blystone* and *Boyde*.

## V

Walton's final contention is that the especially heinous, cruel, or depraved aggravating circumstance as interpreted by the Arizona courts fails to channel the sentencer's discretion as required by the Eighth and Fourteenth Amendments. Walton contends that the Arizona factor fails to pass constitutional muster for the same reasons this Court found Oklahoma's "especially heinous, atrocious, or cruel" ag-

gravating circumstance to be invalid in *Maynard* v. *Cartwright*, 486 U. S. 356 (1988), and Georgia's "outrageously or wantonly vile, horrible or inhuman" circumstance to be invalid in *Godfrey* v. *Georgia*, 446 U. S. 420 (1980).

*Maynard* v. *Cartwright* and *Godfrey* v. *Georgia*, however, are distinguishable in two constitutionally significant respects. First, in both *Maynard* and *Godfrey* the defendant was sentenced by a jury and the jury either was instructed only in the bare terms of the relevant statute or in terms nearly as vague. See 486 U. S., at 358–359, 363–364; 446 U. S., at 426 (plurality opinion). Neither jury was given a constitutional limiting definition of the challenged aggravating factor. Second, in neither case did the state appellate court, in reviewing the propriety of the death sentence, purport to affirm the death sentence by applying a limiting definition of the aggravating circumstance to the facts presented. 486 U. S., at 364; 446 U. S., at 429 (plurality opinion). These points were crucial to the conclusion we reached in *Maynard*. See 486 U. S., at 363–364. They are equally crucial to our decision in this case.

When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*. But the logic of those cases has no place in the context of sentencing by a trial judge. Trial judges are presumed to know the law and to apply it in making their decisions. If the Arizona Supreme Court has narrowed the definition of the "especially heinous, cruel or depraved" aggravating circumstance, we presume that Arizona trial judges are applying the narrower definition. It is irrelevant that the statute itself may not narrow the construction of the factor. Moreover, even if a trial judge fails to apply the narrowing construction or applies an improper construction, the Constitution does not necessarily require that a

state appellate court vacate a death sentence based on that factor. Rather, as we held in *Clemons* v. *Mississippi*, 494 U. S. 738 (1990), a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined or the court may eliminate consideration of the factor altogether and determine whether any remaining aggravating circumstances are sufficient to warrant the death penalty.

When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, *i. e.*, whether they provide *some* guidance to the sentencer. In this case there is no serious argument that Arizona's "especially heinous, cruel or depraved" aggravating factor is not facially vague. But the Arizona Supreme Court has sought to give substance to the operative terms, and we find that its construction meets constitutional requirements.

The Arizona Supreme Court stated that "a crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death," and that "[m]ental anguish includes a victim's uncertainty as to his ultimate fate." 159 Ariz., at 586, 769 P. 2d, at 1032. The court rejected the State's argument that the six days Powell suffered after being shot constituted cruelty within the meaning of the statute. The court pointed out that it had limited the cruelty circumstance in prior cases to situations where the suffering of the victim was intended by or foreseeable to the killer. *Id.*, at 587, 769 P. 2d, at 1033.

In *Maynard* v. *Cartwright*, we expressed approval of a definition that would limit Oklahoma's "especially heinous,

atrocious, or cruel" aggravating circumstance to murders involving "some kind of torture or physical abuse," 486 U. S., at 364–365, but we also noted that such a construction was not the only one "that would be constitutionally acceptable." *Id.*, at 365. The construction given by the Arizona Supreme Court to the cruelty aspect of the Arizona aggravating circumstance is virtually identical to the construction we approved in *Maynard.*

The Arizona Supreme Court's construction also is similar to the construction of Florida's "especially heinous, atrocious, or cruel" aggravating circumstance that we approved in *Proffitt* v. *Florida*, 428 U. S., at 255–256 (joint opinion of Stewart, Powell, and STEVENS, JJ.). Recognizing that the proper degree of definition of an aggravating factor of this nature is not susceptible of mathematical precision, we conclude that the definition given to the "especially cruel" provision by the Arizona Supreme Court is constitutionally sufficient because it gives meaningful guidance to the sentencer. Nor can we fault the state court's statement that a crime is committed in an especially "depraved" manner when the perpetrator "relishes the murder, evidencing debasement or perversion," or "shows an indifference to the suffering of the victim and evidences a sense of pleasure" in the killing. See 159 Ariz., at 587, 769 P. 2d, at 1033.

Walton nevertheless contends that the heinous, cruel, or depraved factor has been applied in an arbitrary manner and, as applied, does not distinguish his case from cases in which the death sentence has not been imposed. In effect Walton challenges the proportionality review of the Arizona Supreme Court as erroneous and asks us to overturn it. This we decline to do, for we have just concluded that the challenged factor has been construed by the Arizona courts in a manner that furnishes sufficient guidance to the sentencer. This being so, proportionality review is not constitutionally required, and we "lawfully may presume that [Walton's] death sentence was not 'wantonly and freakishly' imposed—

and thus that the sentence is not disproportionate within any recognized meaning of the Eighth Amendment." *McCleskey* v. *Kemp*, 481 U. S. 279, 306, 308 (1987); *Pulley* v. *Harris*, 465 U. S. 37, 43 (1984). Furthermore, the Arizona Supreme Court plainly undertook its proportionality review in good faith and found that Walton's sentence was proportional to the sentences imposed in cases similar to his. The Constitution does not require us to look behind that conclusion.

The judgment of the Arizona Supreme Court is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

Today a petitioner before this Court says that a state sentencing court (1) had unconstitutionally *broad* discretion to sentence him to death instead of imprisonment, *and* (2) had unconstitutionally *narrow* discretion to sentence him to imprisonment instead of death. An observer unacquainted with our death penalty jurisprudence (and in the habit of thinking logically) would probably say these positions cannot both be right. The ultimate choice in capital sentencing, he would point out, is a unitary one—the choice between death and imprisonment. One cannot have discretion whether to select the one yet lack discretion whether to select the other. Our imaginary observer would then be surprised to discover that, under this Court's Eighth Amendment jurisprudence of the past 15 years, petitioner would have a strong chance of winning on *both* of these antagonistic claims, simultaneously—as evidenced by the facts that four Members of this Court think he should win on both, see *post*, at 677 (BLACK-MUN, J., dissenting), and that an en banc panel of a Federal Court of Appeals so held in an essentially identical case, see *Adamson* v. *Ricketts*, 865 F. 2d 1011, 1029–1044 (CA9 1988). But that just shows that our jurisprudence and logic have long since parted ways. I write separately to say that, and explain why, I will no longer seek to apply one of the two in-

compatible branches of that jurisprudence. I agree with the Court's analysis of petitioner's first claim, and concur in its opinion as to Parts I, II, and V. As to the second claim, I concur only in the judgment.

I

A

Over the course of the past 15 years, this Court has assumed the role of rulemaking body for the States' administration of capital sentencing—effectively requiring capital sentencing proceedings separate from the adjudication of guilt, see, *e. g., Woodson* v. *North Carolina,* 428 U. S. 280, 301–305 (1976) (plurality opinion); *Gregg* v. *Georgia,* 428 U. S. 153, 195 (1976) (opinion announcing judgment), dictating the type and extent of discretion the sentencer must and must not have, see, *e. g., Lockett* v. *Ohio,* 438 U. S. 586 (1978) (plurality opinion); *Godfrey* v. *Georgia,* 446 U. S. 420 (1980), requiring that certain categories of evidence must and must not be admitted, see, *e. g., Skipper* v. *South Carolina,* 476 U. S. 1 (1986); *Booth* v. *Maryland,* 482 U. S. 496 (1987), undertaking minute inquiries into the wording of jury instructions to ensure that jurors understand their duties under our labyrinthine code of rules, see, *e. g., Caldwell* v. *Mississippi,* 472 U. S. 320 (1985); *Mills* v. *Maryland,* 486 U. S. 367 (1988), and prescribing the procedural forms that sentencing decisions must follow, see, *e. g., McKoy* v. *North Carolina,* 494 U. S. 433 (1990). The case that began the development of this Eighth Amendment jurisprudence was *Furman* v. *Georgia,* 408 U. S. 238 (1972) *(per curiam),* which has come to stand for the principle that a sentencer's discretion to return a death sentence must be constrained by specific standards, so that the death penalty is not inflicted in a random and capricious fashion.

In *Furman,* we overturned the sentences of two men convicted and sentenced to death in state courts for murder and one man so convicted and sentenced for rape, under statutes

that gave the jury complete discretion to impose death for those crimes, with no standards as to the factors it should deem relevant. The brief *per curiam* gave no reasons for the Court's decision, other than to say that "the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Id.*, at 239–240. To uncover the reasons underlying the decision in *Furman*, one must turn to the opinions of the five Justices forming the majority, each of whom wrote separately and none of whom joined any other's opinion. Of these opinions, two rested on the broadest possible ground—that the death penalty was cruel and unusual punishment in all circumstances. See *id.*, at 305 (BRENNAN, J., concurring); *id.*, at 369–371 (MARSHALL, J., concurring). A third, that of Justice Douglas, rested on a narrower ground—that the discretionary capital sentencing systems under which the petitioners had been sentenced were operated in a manner that discriminated against racial minorities and unpopular groups. See *id.*, at 256–257 (concurring opinion).

The critical opinions, however, in light of the subsequent development of our jurisprudence, were those of JUSTICES Stewart and WHITE. They focused on the infrequency and seeming randomness with which, under the discretionary state systems, the death penalty was imposed. Justice Stewart wrote:

> "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed . . . . [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique

. penalty to be so wantonly and so freakishly imposed." *Id.*, at 309–310 (concurring opinion) (footnotes omitted).

JUSTICE WHITE took a similar view. In his opinion the death sentences under review violated the Eighth Amendment because "as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice." *Id.*, at 313. "[T]here is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not," *ibid.*, so that it constitutes a "pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes," *id.*, at 312. The opinions of both Justice Stewart and JUSTICE WHITE went out of the way to say that capital punishment was not in itself a cruel and unusual punishment, and that a mandatory system of capital sentencing, in which everyone convicted of a particular crime received that punishment, would "present quite different issues." *Id.*, at 310–311 (WHITE, J., concurring); see also *id.*, at 307–308 (Stewart, J., concurring).

*Furman* led at least 35 States to adopt new capital sentencing procedures that eliminated some of the discretion previously conferred to impose or withhold the death penalty. See *Gregg* v. *Georgia, supra*, at 179. In 1976, we upheld against Eighth Amendment challenge three "guided discretion" schemes representative of these measures, which, in varying forms, required the sentencer to consider certain specified aggravating and mitigating circumstances in reaching its decision. In the principal case, *Gregg* v. *Georgia, supra*, the three-Justice opinion announcing the judgment read *Furman* as "mandat[ing] that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that *discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action*," *id.*, at 189 (joint opinion of Stewart, Powell, and STEVENS,

JJ.) (emphasis added). See also *id.*, at 221–222 (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment); *Proffitt* v. *Florida*, 428 U. S. 242, 251 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); *id.*, at 260 (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment); *Jurek* v. *Texas*, 428 U. S. 262, 276 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.); *id.*, at 279 (WHITE, J., joined by Burger, C. J., and REHNQUIST, J., concurring in judgment).

Since the 1976 cases, we have routinely read *Furman* as standing for the proposition that "channelling and limiting . . . the sentencer's discretion in imposing the death penalty" is a "fundamental constitutional requirement," *Maynard* v. *Cartwright*, 486 U. S. 356, 362 (1988), and have insisted that States furnish the sentencer with " 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death,' " *Godfrey* v. *Georgia*, 446 U. S., at 428 (footnotes omitted). Only twice since 1976 have we actually invalidated a death sentence because of inadequate guidance to the sentencer, see *Maynard*, *supra*, at 362–364; *Godfrey*, *supra*, at 428–429, 433, but we have repeatedly incanted the principle that "unbridled discretion" is unacceptable, *Penry* v. *Lynaugh*, 492 U. S. 302, 326 (1989), that capital sentencing procedures must constrain and guide the sentencer's discretion to ensure "that the death penalty is not meted out arbitrarily and capriciously," *California* v. *Ramos*, 463 U. S. 992, 999 (1983), that "the State must establish rational criteria that narrow the decisionmaker's judgment," *McCleskey* v. *Kemp*, 481 U. S. 279, 305 (1987), that "death penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion," *California* v. *Brown*, 479 U. S. 538, 541 (1987), that our cases require "procedural protections . . . to ensure that the death penalty will be imposed in a consistent, rational manner," *Barclay* v. *Florida*, 463 U. S. 939, 960 (1983) (STE-

VENS, J., concurring in judgment), and that "[States] must administer [the death] penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not," *Spaziano* v. *Florida*, 468 U. S. 447, 460 (1984). See also *Zant* v. *Stephens*, 462 U. S. 862, 877 (1983); *Eddings* v. *Oklahoma*, 455 U. S. 104, 110 (1982); *Pulley* v. *Harris*, 465 U. S. 37, 51 (1984); *Booth* v. *Maryland*, 482 U. S., at 502; *Mills* v. *Maryland*, 486 U. S., at 374; *Lowenfield* v. *Phelps*, 484 U. S. 231, 244 (1988).

## B

Shortly after introducing our doctrine *requiring* constraints on the sentencer's discretion to "impose" the death penalty, the Court began developing a doctrine *forbidding* constraints on the sentencer's discretion to "*decline* to impose" it. *McCleskey* v. *Kemp, supra*, at 304 (emphasis deleted). This second doctrine—counterdoctrine would be a better word—has completely exploded whatever coherence the notion of "guided discretion" once had.

Some States responded to *Furman* by making death the mandatory punishment for certain categories of murder. We invalidated these statutes in *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), and *Roberts* v. *Louisiana*, 428 U. S. 325 (1976), a plurality of the Court concluding that the sentencing process must accord at least some consideration to the "character and record of the individual offender." *Woodson, supra*, at 304 (plurality opinion). Other States responded to *Furman* by leaving the sentencer some discretion to spare capital defendants, but limiting the kinds of mitigating circumstances the sentencer could consider. We invalidated these statutes in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), a plurality saying the Eighth Amendment requires that the sentencer "not be precluded from considering, as a mitigating factor, *any aspect* of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *id.*,

at 604 (opinion of Burger, C. J., joined by Stewart, Powell, and STEVENS, JJ.) (emphasis omitted and added). The reasoning of the pluralities in these cases was later adopted by a majority of the Court. See *Sumner* v. *Shuman*, 483 U. S. 66 (1987) (embracing *Woodson*); *Eddings* v. *Oklahoma*, *supra* (embracing *Lockett*).

These decisions, of course, had no basis in *Furman*. One might have supposed that curtailing or eliminating discretion in the sentencing of capital defendants was not only consistent with *Furman*, but positively required by it—as many of the States, of course, *did* suppose. But in *Woodson* and *Lockett*, it emerged that uniform treatment of offenders guilty of the same capital crime was not only not *required* by the Eighth Amendment, but was all but *prohibited*. Announcing the proposition that "[c]entral to the application of the [Eighth] Amendment is a determination of contemporary standards regarding the infliction of punishment," *Woodson*, *supra*, at 288, and pointing to the steady growth of discretionary sentencing systems over the previous 150 years (those very systems we had found unconstitutional in *Furman*), *Woodson*, *supra*, at 291–292, the pluralities in those cases determined that a defendant could not be sentenced to death unless the sentencer was convinced, by an unconstrained and unguided evaluation of offender and offense, that death was the appropriate punishment, *id.*, at 304–305; *Lockett*, *supra*, at 604–605. In short, the practice which in *Furman* had been described as the discretion to sentence to death and pronounced constitutionally prohibited, was in *Woodson* and *Lockett* renamed the discretion not to sentence to death and pronounced constitutionally required.

As elaborated in the years since, the *Woodson-Lockett* principle has prevented States from imposing all but the most minimal constraints on the sentencer's discretion to decide that an offender eligible for the death penalty should nonetheless not receive it. We have, in the first place, repeatedly rebuffed States' efforts to channel that discretion by

specifying objective factors on which its exercise should rest. It would misdescribe the sweep of this principle to say that "all mitigating evidence" must be considered by the sentencer. That would assume some objective criterion of what is mitigating, which is precisely what we have forbidden. Our cases proudly announce that the Constitution effectively prohibits the States from excluding from the sentencing decision *any* aspect of a defendant's character or record, or *any* circumstance surrounding the crime: that the defendant had a poor and deprived childhood, or that he had a rich and spoiled childhood; that he had a great love for the victim's race, or that he had a pathological hatred for the victim's race; that he has limited mental capacity, or that he has a brilliant mind which can make a great contribution to society; that he was kind to his mother, or that he despised his mother. *Whatever* evidence bearing on the crime or the criminal the defense wishes to introduce as rendering the defendant less deserving of the death penalty must be admitted into evidence and considered by the sentencer. See, *e. g., Lockett, supra,* at 597 ("character, prior record, age, lack of specific intent to cause death, and . . . relatively minor part in the crime"); *Eddings* v. *Oklahoma, supra,* at 107 (*inter alia,* that the defendant's "parents were divorced when he was 5 years old, and until he was 14 [he] lived with his mother without rules or supervision"); *Hitchcock* v. *Dugger,* 481 U. S. 393, 397 (1987) (*inter alia,* that "petitioner had been one of seven children in a poor family that earned its living by picking cotton; that his father had died of cancer; and that petitioner had been a fond and affectionate uncle"); *Skipper* v. *South Carolina,* 476 U. S., at 4 (that "petitioner had been a well-behaved and well-adjusted prisoner" while awaiting trial). Nor may States channel the sentencer's consideration of this evidence by defining the weight or significance it is to receive—for example, by making evidence of mental retardation relevant only insofar as it bears on the question whether the crime was committed deliberately. See *Penry* v. *Lyn-*

*augh*, 492 U. S. 302, 322–323, 328 (1989). Rather, they must let the sentencer "give effect," *McKoy* v. *North Carolina*, 494 U. S. 433, 442–443 (1990), to mitigating evidence in whatever manner it pleases. Nor, when a jury is assigned the sentencing task, may the State attempt to impose structural rationality on the sentencing decision by requiring that mitigating circumstances be found unanimously, see *id.*, at 443; each juror must be allowed to determine and "give effect" to his perception of what evidence favors leniency, regardless of whether those perceptions command the assent of (or are even comprehensible to) other jurors.

To acknowledge that "there perhaps is an inherent tension" between this line of cases and the line stemming from *Furman*, *McCleskey* v. *Kemp*, 481 U. S., at 363 (BLACK-MUN, J., dissenting), is rather like saying that there was perhaps an inherent tension between the Allies and the Axis Powers in World War II. And to refer to the two lines as pursuing "twin objectives," *Spaziano* v. *Florida*, 468 U. S., at 459, is rather like referring to the twin objectives of good and evil. They cannot be reconciled. Pursuant to *Furman*, and in order "to achieve a more rational and equitable administration of the death penalty," *Franklin* v. *Lynaugh*, 487 U. S. 164, 181 (1988), we require that States "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,'" *Godfrey* v. *Georgia*, 446 U. S., at 428. In the next breath, however, we say that "the State *cannot* channel the sentencer's discretion . . . to consider any relevant [mitigating] information offered by the defendant," *McCleskey* v. *Kemp*, *supra*, at 306 (emphasis added), and that the sentencer must enjoy unconstrained discretion to decide whether any sympathetic factors bearing on the defendant or the crime indicate that he does not "deserve to be sentenced to death," *Penry* v. *Lynaugh*, *supra*, at 326. The latter requirement quite obviously destroys whatever

rationality and predictability the former requirement was designed to achieve.*

The Court has attempted to explain the contradiction by saying that the two requirements serve different functions: The first serves to "narrow" according to rational criteria the class of offenders eligible for the death penalty, while the second guarantees that each offender who is death eligible is not actually sentenced to death without "an individualized assessment of the appropriateness of the death penalty." *Penry* v. *Lynaugh, supra,* at 317; see also *Zant* v. *Stephens,* 462 U. S., at 878–879. But it is not "individualized assessment" that is the issue here. No one asserts that the Con-

---

*JUSTICE STEVENS contends that the purpose of *Furman* is merely to narrow the group of crimes (to which the sentencer's unconstrained discretion is then applied) to some undefined point near the "tip of the pyramid" of murder—the base of that pyramid consisting of all murders, and the apex consisting of a particular type crime of murder defined in minute detail. *Post,* at 715–718 (dissenting opinion). There is, however, no hint in our *Furman* jurisprudence of an attempt to determine what constitutes the critical line below the "tip of the pyramid," and to assess whether *either* the elements of the crime are alone sufficient to bring the statute above that line (in which case no aggravating factors whatever need be specified) *or* whether the aggravating factors are sufficient for that purpose. I read the cases (and the States, in enacting their post-*Furman* statutes, have certainly read them) as requiring aggravating factors to be specified *whenever* the sentencer is given discretion. It is a means of confining the sentencers' discretion—giving them something specific to look for rather than leaving them to wander at large among all aggravating circumstances. That produces a consistency of result which is unachievable—no matter how narrowly the crime is defined—if they are left to take into account any aggravating factor at all. We have, to be sure, held that the discretion-limiting aggravating factor can duplicate a factor already required by the definition of the crime, see *Lowenfield* v. *Phelps,* 484 U. S. 231 (1988), but in those circumstances the sentencer's discretion is *still* focused and confined. We have never allowed sentencers to be given complete discretion without a requisite finding of aggravating factors. If and when the Court redefines *Furman* to permit the latter, and to require an assessment (I cannot imagine on what basis) that a sufficiently narrow level of the "pyramid" of murder has been reached, I shall be prepared to reconsider my evaluation of *Woodson* and *Lockett.*

stitution permits condemnation *en masse*. The issue is whether, in the process of the individualized sentencing determination, the society may specify which factors are relevant, and which are not—whether it may insist upon a rational scheme in which all sentencers making the individualized determinations apply the same standard. That is *precisely* the issue that was involved in *Furman*, no more and no less. Having held, in *Furman*, that the aggravating factors to be sought in the individualized determination must be specified in advance, we are able to refer to the defendants who will qualify under those factors as a "class of death eligibles"—from among whom those actually to receive death will be selected on the basis of unspecified mitigating factors. But if we had held in *Lockett* that the *mitigating* factors to be sought in the individualized determination must be specified in advance, we would equally have been able to refer to the defendants who will qualify under those factors as a "class of mercy eligibles"—from among whom those actually to receive mercy will be selected on the basis of unspecified aggravating factors. In other words, classification *versus* individuation does not *explain* the opposite treatment of aggravating and mitigating factors; it is merely one way of *describing the result* of that opposite treatment. What is involved here is merely setting standards for individualized determinations, and the question remains why the Constitution demands that the aggravating standards and mitigating standards be accorded opposite treatment. It is impossible to understand why. Since the individualized determination is a unitary one (does this defendant deserve death for this crime?) once one says each sentencer must be able to answer "no" for whatever reason it deems morally sufficient (and indeed, for whatever reason any one of 12 jurors deems morally sufficient), it becomes impossible to claim that the Constitution requires consistency and rationality among sentencing determinations to be preserved by strictly limiting the reasons for which each sentencer can say "yes." In fact, ran-

domness and "freakishness" are even more evident in a system that requires aggravating factors to be found in great detail, since it permits sentencers to accord different treatment, for whatever mitigating reasons they wish, not only to two different murderers, but to two murderers whose crimes have been found to be of similar gravity. It is difficult enough to justify the *Furman* requirement so long as the States are *permitted* to allow random mitigation; but to impose it while simultaneously *requiring* random mitigation is absurd. I agree with JUSTICE WHITE's observation that the *Lockett* rule represents a sheer "about-face" from *Furman*, an outright negation of the principle of guided discretion that brought us down the path of regulating capital sentencing procedure in the first place. *Lockett* v. *Ohio*, 438 U. S., at 622 (opinion concurring in part, dissenting in part, and concurring in judgments).

## C

The simultaneous pursuit of contradictory objectives necessarily produces confusion. As THE CHIEF JUSTICE has pointed out, in elaborating our doctrine "the Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed." *Lockett* v. *Ohio*, *supra*, at 629 (REHNQUIST, J., dissenting). Repeatedly over the past 20 years state legislatures and courts have adopted discretion-reducing procedures to satisfy the *Furman* principle, only to be told years later that their measures have run afoul of the *Lockett* principle. Having said in *Furman* that unconstrained discretion in capital sentencing was unacceptable, see *Furman* v. *Georgia*, 408 U. S., at 256–257 (Douglas, J., concurring); *id.*, at 309–310 (Stewart, J., concurring); *id.*, at 311–312 (WHITE, J., concurring), we later struck down mandatory schemes, adopted in response to *Furman*, because they constrained sentencing discretion. See *Woodson* v. *North Carolina*, 428 U. S. 280 (1976). Having sustained specific state sentencing schemes

in 1976 because they provided the constitutionally necessary degree of "guided discretion" in the form of objective sentencing criteria, see, *e. g.*, *Proffitt* v. *Florida*, 428 U. S. 242 (1976); *Jurek* v. *Texas*, 428 U. S. 262 (1976), we later struck down those very schemes because they required the sentencer to confine itself to the factors contained in those objective criteria, see *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987) (Florida); *Penry* v. *Lynaugh*, 492 U. S. 302 (1989) (Texas). Having encouraged the States to adopt the "important additional safeguard against arbitrariness" of requiring specific jury findings supporting its sentencing decision, *Gregg* v. *Georgia*, 428 U. S., at 198 (joint opinion of Stewart, Powell, and STEVENS, JJ.), we later made such findings impossible as to mitigating circumstances (and thus meaningless as a whole) by prohibiting a requirement that the jury agree on mitigating circumstances, *McKoy* v. *North Carolina*, 494 U. S. 433 (1990). For state lawmakers, the lesson has been that a decision of this Court is nearly worthless as a guide for the future; though we approve or seemingly even require some sentencing procedure today, we may well retroactively prohibit it tomorrow.

In a jurisprudence containing the contradictory commands that discretion to impose the death penalty must be limited but discretion not to impose the death penalty must be virtually unconstrained, a vast number of procedures support a plausible claim in one direction or the other. Conscientious counsel are obliged to make those claims, and conscientious judges to consider them. There has thus arisen, in capital cases, a permanent floodtide of stay applications and petitions for certiorari to review adverse judgments at each round of direct and collateral review, alleging novel defects in sentencing procedure arising out of some permutation of either *Furman* or *Lockett*. State courts, attempting to give effect to the contradictory principles in our jurisprudence and reluctant to condemn an offender without virtual certainty that no error has been committed, often suspend the normal rules of procedural bar to give ear to each new claim that

the sentencer's discretion was overconstrained or underconstrained. An adverse ruling typically gives rise to yet another round of federal habeas review — and by the time that is concluded we may well have announced yet another new rule that will justify yet another appeal to the state courts. The effects of the uncertainty and unpredictability are evident in this Court alone, even though we see only the tip of a mountainous iceberg. Since granting certiorari in *McKoy* v. *North Carolina, supra,* on February 21, 1989 (the first of this Term's capital cases to have certiorari granted), we have received over 350 petitions for certiorari in capital cases; 8 were granted, and 84 were held for the 9 cases granted for this Term; 37 were held for this case alone. Small wonder, then, that the statistics show a capital punishment system that has been approved, in many States, by the democratic vote of the people, that has theoretically been approved as constitutional by this Court, but that seems unable to function except as a parody of swift or even timely justice. As of May 1990 there were 2,327 convicted murderers on death row; only 123 have been executed since our 1972 *Furman* decision. NAACP Legal Defense and Educational Fund, Death Row, U. S. A. 1 (1990). Those executions that have been carried out have occurred an average of eight years after the commission of the capital crime. See E. Carnes & S. Stewart, Summary of Post-Furman Capital Punishment Data § VIII (unpublished report by Alabama Assistant Attorneys General on file with Harvard Law School Library, 1988), cited in Powell, Commentary, 102 Harv. L. Rev. 1013, 1038, n. 26 (1989).

In my view, it is time for us to reexamine our efforts in this area and to measure them against the text of the constitutional provision on which they are purportedly based.

## II

The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, see *Robinson* v. *California,* 370 U. S. 660, 666 (1962), provides:

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The requirement as to punishments stands in stark contrast to the requirement for bail and fines, which are invalid if they are "excessive." When punishments other than fines are involved, the Amendment explicitly requires a court to consider not only whether the penalty is severe or harsh, but also whether it is "unusual." If it is not, then the Eighth Amendment does not prohibit it, no matter how cruel a judge might think it to be. Moreover, the Eighth Amendment's prohibition is directed against cruel and unusual *punishments*. It does not, by its terms, regulate the procedures of sentencing as opposed to the substance of punishment. As THE CHIEF JUSTICE has observed, "[t]he prohibition of the Eighth Amendment relates to the character of the punishment, and not to the process by which it is imposed." *Gardner* v. *Florida*, 430 U. S. 349, 371 (1977) (REHNQUIST, J., dissenting). Thus, the procedural elements of a sentencing scheme come within the prohibition, if at all, only when they are of such a nature as systematically to render the infliction of a cruel punishment "unusual."

Our decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), was arguably supported by this text. As I have already described, see Part I–A, *supra*, the critical opinions of Justice Stewart and JUSTICE WHITE in that case rested on the ground that discretionary capital sentencing had made the death sentence such a random and infrequent event among capital offenders ("wanto[n] and freakis[h]," as Justice Stewart colorfully put it) that its imposition had become cruel and unusual. As far as I can discern (this is not the occasion to explore the subject), that is probably not what was meant by an "unusual punishment" in the Eighth Amendment—that is to say, the text did not originally prohibit a traditional form of punishment that is rarely imposed, as opposed to a form of punishment that is not traditional. But the phrase can bear

the former meaning. Moreover, since in most States, until the beginning of this century, the death penalty was mandatory for the convictions for which it was prescribed, see H. Bedau, The Death Penalty in America 10–11 (3d ed. 1982); W. Bowers, Executions in America 8 (1974), it cannot be said that the *Furman* interpretation of the phrase is contradicted by the clear references to a permissible death penalty in the Constitution, see U. S. Const., Amdt. 5; U. S. Const., Amdt. 14, § 1. I am therefore willing to adhere to the precedent established by our *Furman* line of cases, and to hold that when a State adopts capital punishment for a given crime but does not make it mandatory, the Eighth Amendment bars it from giving the sentencer unfettered discretion to select the recipients, but requires it to establish in advance, and convey to the sentencer, a governing standard. See *Maynard* v. *Cartwright*, 486 U. S. 356 (1988); *Godfrey* v. *Georgia*, 446 U. S. 420 (1980).

The *Woodson-Lockett* line of cases, however, is another matter. As far as I can discern, that bears no relation whatever to the text of the Eighth Amendment. The mandatory imposition of death—without sentencing discretion—for a crime which States have traditionally punished with death cannot possibly violate the Eighth Amendment, because it will not be "cruel" (neither absolutely nor for the particular crime) and it will not be "unusual" (neither in the sense of being a type of penalty that is not traditional nor in the sense of being rarely or "freakishly" imposed). It is quite immaterial that most States have abandoned the practice of automatically sentencing to death all offenders guilty of a capital crime, in favor of a separate procedure in which the sentencer is given the opportunity to consider the appropriateness of death in the individual case, see *Woodson* v. *North Carolina*, 428 U. S., at 294–295 (plurality opinion); still less is it relevant that mandatory capital sentencing is (or is alleged to be) out of touch

with "'contemporary community values'" regarding the administration of justice, *id.*, at 295 (citation omitted).

I am aware of the argument, see *id.*, at 302–303; *Roberts* v. *Louisiana*, 428 U. S., at 333–335 (plurality opinion), that mandatory capital sentencing schemes may suffer from the same defects that characterize absolutely discretionary schemes. In mandatory systems, the argument goes, juries frequently acquit offenders whom they find guilty but believe do not deserve the death penalty for their crime; and because this "jury nullification" occurs without the benefit of any guidance or standards from the State, the result is the same "arbitrary and capricious imposition of death sentences" struck down in *Furman*. One obvious problem with this argument is that it proves too much, invalidating *Furman* at the same time that it validates *Woodson*. If juries will ignore their instructions in determining guilt in a mandatory capital sentencing scheme, there is no reason to think they will not similarly chafe at the "'clear and objective standards' . . . provid[ing] 'specific and detailed guidance,'" *Godfrey* v. *Georgia, supra,* at 428 (footnotes omitted), that *Furman* requires. The *Furman* approach must be preferred, since it is facially implausible that the risk of arbitrariness arising from juries' ignoring their instructions is greater than the risk of arbitrariness from giving them no instructions at all. The theory of "unusualness" adopted in *Furman* is tenuous enough when used to invalidate explicitly conferred standardless sentencing discretion; I am unwilling to extend that theory to situations in which the sentencer is *denied* that discretion, on the basis of a conjecture (found nowhere else in the law) that juries systematically disregard their oaths.

Despite the fact that I think *Woodson* and *Lockett* find no proper basis in the Constitution, they have some claim to my adherence because of the doctrine of *stare decisis*. I do not reject that claim lightly, but I must reject it here. My initial and my fundamental problem, as I have described it in detail above, is not that *Woodson* and *Lockett* are wrong,

but that *Woodson* and *Lockett* are rationally irreconcilable with *Furman*. It is that which led me into the inquiry whether either they or *Furman* was wrong. I would not know how to apply them—or, more precisely, how to apply both them and *Furman*—if I wanted to. I cannot continue to say, in case after case, what degree of "narrowing" is sufficient to achieve the constitutional objective enunciated in *Furman* when I know that that objective is in any case impossible of achievement because of *Woodson-Lockett*. And I cannot continue to say, in case after case, what sort of restraints upon sentencer discretion are unconstitutional under *Woodson-Lockett* when I know that the Constitution positively *favors* constraints under *Furman*. *Stare decisis* cannot command the impossible. Since I cannot possibly be guided by what seem to me incompatible principles, I must reject the one that is plainly in error.

The objectives of the doctrine of *stare decisis* are not furthered by adhering to *Woodson-Lockett* in any event. The doctrine exists for the purpose of introducing certainty and stability into the law and protecting the expectations of individuals and institutions that have acted in reliance on existing rules. As I have described, the *Woodson-Lockett* principle has frustrated this very purpose from the outset — contradicting the basic thrust of much of our death penalty jurisprudence, laying traps for unwary States, and generating a fundamental uncertainty in the law that shows no signs of ending or even diminishing.

I cannot adhere to a principle so lacking in support in constitutional text and so plainly unworthy of respect under *stare decisis*. Accordingly, I will not, in this case or in the future, vote to uphold an Eighth Amendment claim that the sentencer's discretion has been unlawfully restricted.

## III

I turn, finally, to petitioner's Eighth Amendment claims in the present case.

With respect to the *Furman* claim, I agree with the Court's analysis and conclusion, and join those portions of its opinion. The aggravating circumstance found to exist in this case, that the murder was committed in an "especially heinous, cruel or depraved" manner—cruelty being defined as involving the infliction of mental anguish or physical abuse, and depravity defined as involving the relishing of the murder or the victim's suffering—defines with reasonable specificity certain elements that distinguish the death-eligible offense from other murders. They are precise enough, in my view, both to guide the sentencer and to enable review of the sentence.

As to petitioner's claim that in two respects the Arizona procedure deprived the sentencer of discretion to consider all mitigating circumstances: For the reasons stated above I do not believe that claim, if correct, states an Eighth Amendment violation.

I therefore concur in part and concur in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.*

The Court's most cavalier application today of longstanding Eighth Amendment doctrines developed over the course of two decades of careful and sustained inquiry, when added to the host of other recent examples of crabbed application of doctrine in the death penalty context, see, *e. g.*, *Blystone* v. *Pennsylvania*, 494 U. S. 299 (1990); *Boyde* v. *California*, 494 U. S. 370 (1990); cf. *Saffle* v. *Parks*, 494 U. S. 484 (1990); *Sawyer* v. *Smith*, *ante*, p. 227, suggests that this Court is losing sight of its responsibility to ensure that the ultimate criminal sanction is meted out only in accordance with constitutional principle. While I join JUSTICE BLACKMUN's dissenting opinions in today's decisions, I also adhere to my

---

*[This opinion applies also to No. 89–189, *Lewis* v. *Jeffers*, *post*, p. 764.]

view that the death penalty is in all circumstances a cruel and unusual punishment:

"The fatal constitutional infirmity in the punishment of death is that it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded. [It is] thus inconsistent with the fundamental premise of the [Cruel and Unusual Punishments] Clause that even the vilest criminal remains a human being possessed of common human dignity.' As such it is a penalty that 'subjects the individual to a fate forbidden by the principle of civilized treatment guaranteed by the [Clause].' I therefore would hold, on that ground alone, that death is today a cruel and unusual punishment prohibited by the Clause. 'Justice of this kind is obviously no less shocking than the crime itself, and the new "official" murder, far from offering redress for the offense committed against society, adds instead a second defilement to the first.'" *Gregg* v. *Georgia,* 428 U. S. 153, 230–231 (1976) (dissenting opinion) (citations and footnote omitted).

See also *Furman* v. *Georgia,* 408 U. S. 238, 257–306 (1972) (concurring opinion).

Even if I did not believe that the death penalty is wholly inconsistent with the constitutional principle of human dignity, I would agree that the concern for human dignity lying at the core of the Eighth Amendment requires that a decision to impose the death penalty be made only after an assessment of its propriety in each individual case.

"A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of

a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.).

Thus "a system of capital punishment at once [must be] consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings* v. *Oklahoma*, 455 U. S. 104, 110 (1982).*

In the past, "this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Id.*, at 118 (O'CONNOR, J., concurring). But today's decisions reflect, if anything, the opposing concern that States ought to be able to execute pris-

---

*JUSTICE SCALIA's separate opinion dismissing the settled principle underlying *Lockett* v. *Ohio*, 438 U. S. 586 (1978), based on the assertion that this doctrinal principle cannot be reconciled with that underlying *Furman* v. *Georgia*, 408 U. S. 238 (1972), reflects a misdescription and apparent misunderstanding of our doctrine. JUSTICE SCALIA's concern that the *Lockett* principle is not commanded by the explicit text of the Eighth Amendment has long been rejected by this Court; it is well established that the Eighth Amendment's proscription of cruel and unusual punishments "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion); see *Weems* v. *United States*, 217 U. S. 349, 378 (1910). The *Lockett* and *Furman* principles speak to different concerns underlying our notion of civilized punishment; the *Lockett* rule flows primarily from the Amendment's core concern for human dignity, see *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), whereas the *Furman* principle reflects the understanding that the Amendment commands that punishment not be meted out in a wholly arbitrary and irrational manner. 428 U. S., at 303. Our cases have applied these principles together to "insis[t] that capital punishment be imposed fairly, *and* with reasonable consistency, or not at all." *Eddings* v. *Oklahoma*, 455 U. S., at 112 (emphasis added); see, *e. g.*, *Penry* v. *Lynaugh*, 492 U. S. 302, 319, 326–328 (1989). See generally *post*, at 714–719 (STEVENS, J., dissenting).

oners with as little interference as possible from our established Eighth Amendment doctrine.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

In my view, two Arizona statutory provisions, pertinent here, run afoul of the established Eighth Amendment principle that a capital defendant is entitled to an individualized sentencing determination which involves the consideration of all relevant mitigating evidence. The first is the requirement that the sentencer may consider *only* those mitigating circumstances proved by a preponderance of the evidence. The second is the provision that the defendant bears the burden of establishing mitigating circumstances "sufficiently substantial to call for leniency." I also conclude that Arizona's "heinous, cruel or depraved" aggravating circumstance, as construed by the Arizona Supreme Court, provides no meaningful guidance to the sentencing authority and, as a consequence, is unconstitutional.

I therefore dissent from the Court's affirmance of Jeffrey Alan Walton's sentence of death.

I

During the past 15 years, this Court's death penalty jurisprudence consistently has stressed the importance of an individualized-sentencing process, one that permits "the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson* v. *North Carolina*, 428 U. S. 280, 303 (1976) (plurality opinion). Such a procedure is required because "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Id.*, at 304. A plurality of this Court stated in

*Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978), that a capital sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis in original.) In *Eddings* v. *Oklahoma*, 455 U. S. 104, 114–115 (1982), a majority held that "[t]he sentencer, and the [state appellate court] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."[1] The Court, moreover, has insisted that the substance as well as the form of *Lockett* must be respected. See *Penry* v. *Lynaugh*, 492 U. S. 302, 319 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence").

From those holdings two closely related principles emerge. The first is that the "qualitative difference" between death and all other penalties necessitates a greater degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428 U. S., at 305 (plurality opinion). The second is that the particularized sentencing procedure mandated by the Eighth Amendment requires that the sentencer be allowed to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett* v. *Ohio*, 438 U. S., at 604 (plurality opinion). Only if the defendant is allowed an unrestricted opportunity to present relevant mitigating evidence will a capital sentencing procedure be deemed sufficiently reliable to satisfy constitutional standards. The Court said in *Eddings* that "the rule in *Lockett*

---

[1] The Court in *Eddings* further instructed that on remand "the state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." 455 U. S., at 117.

recognizes that a consistency produced by ignoring individual differences is a false consistency." 455 U. S., at 112.

The Court today upholds an Arizona statute which (a) excludes from the sentencer's consideration all mitigating circumstances that the defendant has failed to prove by a preponderance of the evidence, and (b) places upon the capital defendant the burden of demonstrating that the mitigating circumstances so proved are "sufficiently substantial to call for leniency." The plurality makes no effort to explain how these provisions are consistent with the Eighth Amendment principles announced in *Woodson*, *Lockett*, and their progeny.[2] Indeed, the plurality's analysis of these issues in-

---

[2] The plurality does assert, however, that its analysis is consistent with *Lockett* and its progeny. See *ante*, at 649–650. In contrast, JUSTICE SCALIA, who provides the fifth vote for affirmance, expresses no view on the question whether the Arizona statute comports with the standards announced in the Court's prior decisions. He argues, instead, that any violation of *Lockett* is immaterial because *Lockett* should be overruled. Eight Members of the Court agree that *Lockett* remains good law, and I shall not attempt today a detailed exposition of this Court's Eighth Amendment jurisprudence. I do wish, however, to make two brief observations:

First, JUSTICE SCALIA's argument is not new—as his citation to then-JUSTICE REHNQUIST's dissent in *Lockett* demonstrates. See *ante*, at 667. The rule that a capital sentencer must be allowed to consider all relevant mitigating evidence has been vigorously opposed, intensely debated, and eventually accepted by all Members of this Court as a common starting point for analysis in individual cases. See, *e. g.*, *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987) (SCALIA, J., writing for a unanimous Court). This history suggests not only that considerations of *stare decisis* support continued application of the *Lockett* rule. It indicates as well that this Court's Eighth Amendment jurisprudence is not so patently irrational that it should be abruptly discarded.

My second observation relates to the integrity of this Court's adjudicative process. The validity of *Lockett* has been presumed throughout this case, and the arguments raised by JUSTICE SCALIA have not been addressed in petitioner's brief or argument. It is disturbing that the decisive vote in a capital case should turn on a single Justice's rejection of a line of authority that both parties to this controversy, and eight Members of this Court, have accepted.

cludes virtually no discussion of capital cases, and those that the majority does discuss are demonstrably inapposite. Rather, the plurality relies on "analogous" cases that do not involve the death penalty. Its analysis thereby ignores what I had thought to be settled principles regarding the distinctive nature of capital sentencing.

## A

The Arizona capital sentencing statute flatly provides: "[T]he burden of establishing the existence of the [mitigating] circumstances included in subsection G of this section is on the defendant." Ariz. Rev. Stat. Ann. § 13–703(C) (1989). The Arizona Supreme Court has construed the statute to require that any mitigating circumstances must be proved by a preponderance of the evidence. See, *e. g.*, *State* v. *McMurtrey*, 143 Ariz. 71, 73, 691 P. 2d 1099, 1101 (1984). There can be no doubt that this provision of Arizona law excludes from the sentencer's consideration relevant mitigating evidence that might affect the determination whether the death penalty is appropriate. Exclusion of that evidence is unsupported by this Court's decisions and serves no legitimate state interest.

The plurality does not analyze this case within the framework established by our Eighth Amendment decisions. Rather, the plurality relies almost exclusively on noncapital cases upholding the State's right to place upon the defendant the burden of proving an affirmative defense. See *ante*, at 650. Reliance on these cases is misplaced, however, since those decisions rest upon a premise that is wholly inapplicable in the capital sentencing context. In *Patterson* v. *New York*, 432 U. S. 197 (1977), the Court explained the justification in a noncapital case for allowing the burden of persuasion as to affirmative defenses to be placed upon the defendant rather than the State:

"The Due Process Clause, as we see it, does not put New York to the choice of abandoning those defenses or un-

dertaking to disprove their existence in order to convict of a crime which otherwise is within its constitutional powers to sanction by substantial punishment.

   .      .      .      .      .

"... [I]n each instance of a murder conviction under the present law, New York will have proved beyond a reasonable doubt that the defendant has intentionally killed another person, an act which it is not disputed the State may constitutionally criminalize and punish. *If the State nevertheless chooses to recognize a factor that mitigates the degree of criminality or punishment, we think the State may assure itself that the fact has been established with reasonable certainty.* To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate." *Id.*, at 207–209 (emphasis added).

The Court's decision thus rested upon an argument that "the greater power includes the lesser": since the State constitutionally could decline to recognize the defense *at all*, it could take the lesser step of placing the burden of proof upon the defendant. That reasoning is simply inapposite when a capital defendant introduces mitigating evidence, since the State lacks the greater power to exclude the evidence entirely.[*]

But it makes no sense to analyze petitioner's claim of *Lockett* error by drawing on "analogous" cases outside the sphere of capital sentencing. In developing the requirement

---

[*]This is not the first time a Member of this Court has recognized the connection between the State's greater power to eliminate all consideration of mitigating evidence and its lesser power to place the burden of proof on the defendant. See *Lockett v. Ohio*, 438 U. S. 586, 633 (1978) (REHNQUIST, J., concurring in part and dissenting in part) ("Because I continue to believe that the Constitution is not offended by the State's refusal to consider mitigating factors at all, there can be no infirmity in shifting the burden of persuasion to the defendant when it chooses to consider them").

of individualized capital sentencing (with unlimited presentation of relevant mitigating evidence), this Court has not purported to rely on principles applicable to criminal prosecutions generally. Instead, the Court's Eighth Amendment jurisprudence explicitly has proceeded from the premise "that death is a punishment different from all other sanctions in kind rather than degree." *Woodson* v. *North Carolina*, 428 U. S., at 303–304 (plurality opinion).[4] To suggest that the principles announced in *Lockett* and *Eddings* are applicable only insofar as they are consistent with the constitutional rules governing noncapital cases is to deprive those decisions of all significance.

Application of the preponderance standard in this context is especially problematic in light of the fact that the "existence" of a mitigating factor frequently is not a factual issue to which a "yes" or "no" answer can be given. See *Stebbing* v. *Maryland*, 469 U. S. 900, 902–904 (1984) (MARSHALL, J., dissenting from denial of certiorari). The statute, for example, lists as a first mitigating circumstance the fact that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired . . . ." Ariz. Rev. Stat. Ann. § 13–703(G)(1) (1989). Petitioner offered evidence of childhood sexual abuse. Presumably, no individual who suffers such treatment is wholly unaffected; at the same time, it is rare that such an individual is so deeply traumatized that his impairment furnishes a complete defense for his actions. The question whether an individual's capacity to behave lawfully is "impaired" is one of degree, not an either/or propo-

---

[4] The plurality in *Lockett* stated: "We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes. . . . Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases." *Id.*, at 604–605.

sition. The preponderance standard, however, encourages the sentencer to conclude that unless some vaguely defined threshold of "significance" has been reached, the evidence of abuse and consequent impairment cannot be considered *at all.*

Indeed, it appears that the Arizona Supreme Court has applied the statute in just this fashion. See, *e. g., State* v. *Wallace,* 151 Ariz. 362, 369, 728 P. 2d 232, 239 (1986) ("[W]e find that neither defendant's 'difficult earlier years' nor his use of 'various drugs' so affected his capacity to conform to the requirements of law that they constitute mitigating factors under § 13–703(G)(1)"), cert. denied, 483 U. S. 1011 (1987); *State* v. *Rossi,* 146 Ariz. 359, 367, 706 P. 2d 371, 379 (1985) (intoxication or duress is not a mitigating circumstance unless it is substantial); *State* v. *Woratzeck,* 134 Ariz. 452, 458, 657 P. 2d 865, 871 (1982) (same); *State* v. *Nash,* 143 Ariz. 392, 406, 694 P. 2d 222, 236 (State acknowledged some degree of mental impairment but argued that "it was not significant enough to be a mitigating circumstance"), cert. denied, 471 U. S. 1143 (1985). The Arizona Supreme Court has not simply held that duress or impairment which falls below the threshold should be given reduced weight at the final stage of the sentencing process, when aggravating and mitigating circumstances are balanced. Rather, it has held that duress or impairment which falls below the threshold is not a mitigating factor. It is therefore misleading, in many instances, to characterize an Arizona court's rejection of proffered mitigating evidence as a determination that the evidence should not be credited. The trial judge instead may be acting upon the belief that a defendant's impairment, though proved, is not "significant" within the meaning of the statute. Thus, under Arizona law, a sentencing judge is entitled to give *no* weight to mitigating evidence on the ground that the evidence is *not mitigating enough.* Under the guise of a burden of proof,

the statute provides that some mitigating evidence is not to be considered at all.[5]

Even when the trial judge's rejection of a particular mitigating circumstance is based on credibility determinations, application of the preponderance standard is unwarranted. Mitigating evidence that fails to meet this standard is not so unreliable that it has no proper place in the sentencing decision: Decisions as to punishment, like decisions as to guilt or innocence, will often be based on the *cumulative* effect of several pieces of evidence, no one of which by itself is fully persuasive. The problems with the preponderance standard are compounded when the defendant presents several possible mitigating factors. A trial judge might be 49% convinced as to each of 10 mitigating circumstances; yet he would be forced to conclude, as a matter of law, that there was no mitigation to weigh against the aggravating factors.

The Arizona Supreme Court has articulated two closely related justifications for placing upon the capital defendant the burden of proving that a mitigating circumstance exists. The court has asserted that "[f]acts which would tend to show mitigation are peculiarly within the knowledge of a defendant," *State* v. *Smith*, 125 Ariz. 412, 416, 610 P. 2d 46, 50 (1980), and that "[t]o require the State to negate every mitigating circumstance would place an impermissible burden on the State," *State* v. *Watson*, 120 Ariz. 441, 447, 586 P. 2d

---

[5] One might ask what would happen if the defendant argued that he had proved the mitigating circumstance of "moderate impairment." Presumably the Arizona Supreme Court would respond that no such mitigating factor is recognized under Arizona law. In prior decisions indicating that certain proffered evidence of impairment or duress would not constitute a mitigating factor, that court has relied on the language of the Arizona statute, which requires that impairment be "significant" and duress "substantial." See, e. g., *State* v. *Rossi*, 146 Ariz. 359, 366–367, 706 P. 2d 371, 378–379 (1985). Rejection of mitigating evidence on the ground that it does not support a mitigating circumstance *as defined in the statute*, however, cannot be reconciled with *Hitchcock* v. *Dugger*, 481 U. S. 393 (1987), in which this Court held that a capital defendant cannot be restricted to proof of statutory mitigating factors.

1253, 1259 (1978), cert. denied, 440 U. S. 924 (1979). Until today, this Court has never identified a state interest which outweighs the capital defendant's right to unrestricted presentation of mitigating evidence. Even if such an interest could exist, however, the interests advanced by the State in support of the preponderance standard do not withstand scrutiny.

The State's justifications are not without force when a criminal defendant offers an affirmative defense in a trial to determine guilt or innocence. A jury's decision as to an affirmative defense *is* a binary choice: either the defense is accepted or it is not. Since the jury's acceptance of the defense automatically results in an acquittal (or in conviction on a lesser charge), the State may suffer real prejudice if the defense is established on the basis of minimally persuasive evidence which the State has no practical opportunity to rebut — especially if it is difficult to anticipate the defenses that a particular individual may offer. In contrast, if a capital sentencer believes that certain mitigating evidence has *some* persuasive value, but does not meet the preponderance standard, the sentencer simply may give that evidence reduced weight — weight proportional to its persuasiveness — at the final balancing stage.[6] No legitimate interest is served

---

[6] See *Eddings* v. *Oklahoma*, 455 U. S. 104, 114–115 (1982) ("The sentencer, and the [state appellate court] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").

As the Arizona Supreme Court has recognized, the determination that an aggravating or mitigating factor exists does not require that the factor be given any particular weight. "The statute does not require that the number of aggravating circumstances be weighed against the number of mitigating circumstances. One mitigating circumstance, for example, may be 'sufficiently substantial' to outweigh two aggravating circumstances. The converse is also true — one aggravating circumstance could be so substantial that two or more mitigating circumstances would not be 'sufficiently substantial to call for leniency. A. R. S. § 13–454(D).'" *State* v. *Brookover*, 124 Ariz. 38, 42, 601 P. 2d 1322, 1326 (1979).

by forbidding the sentencer to give such evidence any effect at all.

The Arizona rule at issue here falls well within the prohibition announced in *Lockett* and its progeny. The statute defines a wide range of relevant mitigating evidence—evidence with some degree of persuasiveness which has not been proved by a preponderance—that *cannot* be given effect by the capital sentencer. That rule finds no support in this Court's precedents, and it serves no legitimate governmental interest. I therefore conclude that the Arizona death penalty statute, as construed by the Supreme Court of Arizona, impermissibly limits the sentencer's consideration of relevant mitigating evidence, and thereby violates the Eighth Amendment.[7]

### B

I also believe that the Constitution forbids the State of Arizona to place upon the capital defendant the burden of proving mitigating circumstances that are "sufficiently substantial to call for leniency." Ariz. Rev. Stat. Ann. § 13–703(E) (1989). Once an aggravating circumstance has been established, the Arizona statute mandates that death is to be deemed the appropriate penalty unless the defendant proves otherwise. That statutory provision, in my view, establishes a "presumption of death"[8] in violation of the Eighth Amendment.

---

[7] Nor is Arizona's decision to place the burden of proving mitigation on the defendant saved by the fact that the State is required to prove aggravating circumstances beyond a reasonable doubt. See *McCleskey* v. *Kemp*, 481 U. S. 279, 304 (1987) ("In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence") (emphasis in original).

[8] See *Adamson* v. *Ricketts*, 865 F. 2d 1011, 1041 (CA9 1988) (en banc), cert. pending, No. 88–1553. See also *Jackson* v. *Dugger*, 837 F. 2d 1469, 1474 (CA11), cert. denied, 486 U. S. 1026 (1988).

The Arizona Supreme Court repeatedly has indicated that a defendant's mitigating evidence will be deemed "sufficiently substantial to call for leniency" only if the mitigating factors "outweigh" those in aggravation.[9]   That court has sustained the requirement on the ground that "[w]hen the issue of guilt is settled and only the question of punishment remains, due process is not offended by requiring the already guilty defendant to carry the burden of showing why he should receive leniency." *State* v. *Watson*, 120 Ariz., at 447, 586 P. 2d, at 1259.   If the mitigating and aggravating circumstances are in equipoise, the statute requires that the trial judge impose capital punishment.   The assertion that a sentence of death may be imposed in such a case runs directly counter to the Eighth Amendment requirement that a capital sentence must rest upon a "determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428 U. S., at 305 (plurality opinion).

The plurality takes a hard-line approach and makes little effort to ground its holding on our Eighth Amendment jurisprudence.   In support of its position, the plurality cites only two very recent capital cases, *Blystone* v. *Pennsylvania*, 494 U. S. 299 (1990), and *Boyde* v. *California*, 494 U. S. 370 (1990).   Reliance even on these precedents is misplaced. The statutes upheld in those cases provided that the death penalty would be imposed "only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." *Blystone*, 494 U. S., at 305.   In neither *Boyde* nor *Blystone* did the challenged statute require a capi-

---

[9] See, *e. g.*, *State* v. *McCall*, 160 Ariz. 119, 125, 770 P. 2d 1165, 1171 (1989); *State* v. *Mauro*, 159 Ariz. 186, 208, 766 P. 2d 59, 81 (1988); *State* v. *Moorman*, 154 Ariz. 578, 587, 744 P. 2d 679, 688 (1987); *State* v. *LaGrand*, 153 Ariz. 21, 37, 734 P. 2d 563, 579, cert. denied, 484 U. S. 872 (1987); *State* v. *McMurtrey*, 151 Ariz. 105, 110, 726 P. 2d 202, 207 (1986), cert. denied, 480 U. S. 911 (1987).

tal sentence when aggravating and mitigating factors are evenly balanced. Those decisions simply do not speak to the issue posed by the Arizona statute: whether the State permissibly may place upon the capital defendant the burden of demonstrating that a sentence of death is *not* appropriate.

The plurality does not attempt to explain why Arizona may require a capital sentence in a case where aggravating and mitigating circumstances are evenly balanced.[10] Indeed, the plurality does not even acknowledge that this is the dispositive question. Instead, it offers only a conclusory assertion: "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Ante*, at 650. One searches in vain for any hint of a limiting principle. May a State require that the death penalty be imposed whenever an aggravating factor is established and mitigating circumstances do not "*substantially* outweigh" those in aggravation? May a state statute provide that a death sentence is presumptively appropriate whenever an aggravating circumstance is proved, and that the presumption can be rebutted only by a showing that mitigating circumstances are "extraordinarily great"? These formulations would appear to satisfy the plurality's test: viz., that the State is required to establish an aggravating circumstance, and no mitigating evidence is excluded from the sentencer's consideration.[11] But the right to present mitigating

[10] The State's asserted interest in ensuring that only "reliable" evidence is considered at the final balancing stage of course provides no basis for a requirement that death be imposed whenever the mitigating evidence found to be reliable evenly balances the aggravating circumstances.

[11] The fact that the presumption of death is triggered only by the finding of an aggravating circumstance does not save the statute. See *Sumner* v. *Shuman*, 483 U. S. 66, 78 (1987) (proof of an aggravating factor "do[es] not provide an adequate basis on which to determine whether the death sen-

evidence is rendered all but meaningless if the rules that guide the sentencer's deliberations virtually ensure that the mitigating evidence will not change the outcome.[12]

Like the plurality's analysis of the requirement that mitigating circumstances be proved by a preponderance of the evidence, its approval of this provision appears to rest upon an analogy between mitigating evidence in capital sentencing and affirmative defenses in noncapital cases.   In noncapital cases, of course, the States are given broad latitude to sacrifice precision for predictability by imposing determinate sentences and restricting the defendant's ability to present evidence in mitigation or excuse.   If the States were similarly free to make capital punishment mandatory for specified crimes, and to prohibit the introduction of mitigating evidence or declare such evidence to be irrelevant, the plurality's reasoning today would be unassailable.   There then could be no objection to a sentencing scheme which permitted a defendant to argue that the death penalty was inappropriate in his case, but placed upon his shoulders the burden of persuading the sentencer.   This Court, however, repeatedly has recognized that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed," *Lockett* v. *Ohio*, 438 U. S., at 604 (plurality opinion), and that in capital cases "the punishment should be directly related to the personal culpability of the defendant," *Penry* v. *Lynaugh*, 492 U. S., at 327.   I see no way that these principles can be squared with

_____

tence is the appropriate sanction in any particular case"; capital defendant is still entitled to individualized consideration of mitigating evidence).

[12] See *Penry* v. *Lynaugh*, 492 U. S. 302, 319 (1989) ("[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.   The sentencer must also be able to consider and give effect to that evidence in imposing sentence"); *Franklin* v. *Lynaugh*, 487 U. S. 164, 185 (1988) (O'CONNOR, J., concurring in judgment) ("Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration").

a capital sentencing scheme which provides that doubtful cases should be resolved in favor of a sentence of death. I therefore conclude that the Constitution bars Arizona from placing upon a capital defendant the burden of proving that mitigating circumstances are "sufficiently substantial to call for leniency."

## II

In *Godfrey* v. *Georgia*, 446 U. S. 420 (1980), we considered Georgia's "outrageously or wantonly vile, horrible or inhuman" aggravating circumstance. The plurality concluded: "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" *Id.*, at 428–429. Two Terms ago, in *Maynard* v. *Cartwright*, 486 U. S. 356 (1988), the Court unanimously struck down an Oklahoma death sentence based in part upon that State's "especially heinous, atrocious, or cruel" aggravating circumstance. The Court noted that "the language of the Oklahoma aggravating circumstance at issue . . . gave no more guidance than the 'outrageously or wantonly vile, horrible or inhuman' language that the jury returned in its verdict in *Godfrey*." *Id.*, at 363–364.

The Arizona statute at issue today lists as an aggravating circumstance the conclusion that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." Ariz. Rev. Stat. Ann. § 13–703(F)(6) (1989) (the (F)(6) circumstance). The Arizona Supreme Court consistently has held that "[t]hese terms are considered disjunctive; the presence of any one of three factors is an aggravating circumstance." *State* v. *Beaty*, 158 Ariz. 232, 242, 762 P. 2d 519, 529 (1988), cert. denied, 491 U. S. 910 (1989). At the sentencing phase in the present case, the State relied primarily on medical evidence detailing the injuries that the victim Powell suffered when he regained consciousness after the

shooting.[13] The trial judge's sentencing order stated that he found that Walton had "committed the offense in an extremely heinous, cruel or depraved manner," App. 56, but did not specify the basis for that finding. In its "independent review" of the capital sentence, the Arizona Supreme Court held that the (F)(6) circumstance was not supported by evidence of Powell's suffering after the shooting, since Walton could not have foreseen that Powell would survive his wound. The court found, however, that the murder was especially cruel since "Powell suffered great mental anguish both during the car ride when his fate was uncertain and in his final march into the desert when his fate had become certain." 159 Ariz. 571, 587, 769 P. 2d 1017, 1033 (1989). The court also indicated that a finding of depravity would be supported by Walton's comment some hours after the shooting that he had "never seen a man pee in his pants before." *Ibid.*

In sustaining Walton's sentence of death, the majority offers two principal grounds upon which, it says, *Godfrey* and *Maynard* may be distinguished. First, the majority points out that capital sentencing in Arizona is conducted by a trial judge who is presumed to be aware of any limiting construction announced by the State Supreme Court. *Ante,* at 653. Second, the majority notes that the Arizona Supreme Court itself "purport[ed] to affirm the death sentence by applying a limiting definition of the aggravating circumstance to the facts presented." *Ibid.* In my view, neither of these factors supports the Court's decision to affirm petitioner's death sentence.

---

[14] Defense counsel objected to the introduction of this testimony on the ground that Walton could not have foreseen Powell's suffering after the shooting, since Walton reasonably believed that Powell was dead. The trial judge overruled the objection on the ground that "the testimony that I understand he's going to testify to certainly goes to cruelty. . . ." Tr. 233 (Jan. 26, 1987).

## A

Unlike a jury, a sentencing judge is presumed to know the law as stated in the controlling opinions of the State Supreme Court. Even if the aggravating circumstance is vague on its face, the sentence will be valid if the judge's discretion has been suitably channeled by the "instructions" provided by the appellate court's construction of the statute. The trial judge's familiarity with the State Supreme Court's opinions, however, will serve to narrow his discretion only if that body of case law articulates a construction of the aggravating circumstance that is coherent and consistent, and that meaningfully limits the range of homicides to which the aggravating factor will apply.[14] One therefore would expect the majority to analyze Arizona Supreme Court decisions issued prior to the imposition of petitioner's sentence (Jan. 27, 1987), in order to determine whether the judge who sentenced Walton to death can be presumed to have acted on the basis of a constitutionally sufficient limiting construction of the aggravating factor. The Court, however, cites no Arizona cases at all, justifying the omission as a refusal to second-guess the State Supreme Court's proportionality review. *Ante*, at 655–656. The Court thus distinguishes *Godfrey* and *Maynard* on the ground that Arizona sentencing judges are presumed to read and be guided by the opinions of the Arizona Supreme Court, yet insists, as a matter of principle, that it is barred from determining whether those opinions furnish con-

---

[14] The Arizona Supreme Court stated: "[T]he trial court's finding of cruelty is supported by the mental torment of the victim prior to the shooting rather than the events which took place afterwards." 159 Ariz. 571, 587, 769 P. 2d 1017, 1033 (1989). The trial judge, however, made no "finding of cruelty": he found more generally that Walton "committed the offense in an extremely heinous, cruel or depraved manner." The trial judge's sentence therefore can stand only if all three of the statutory terms have been given constitutionally sufficient limiting constructions.

stitutionally adequate guidance. This, it seems to me, is strange and unusual reasoning indeed.[15]

Had the majority examined the Arizona Supreme Court's application of the "especially heinous, cruel or depraved" aggravating circumstance, it would have been hard pressed to conclude that the state court has placed meaningful limitations on the scope of the (F)(6) factor. The Arizona Supreme Court attempted to define the statutory terms in *State* v. *Knapp*, 114 Ariz. 531, 562 P. 2d 704 (1977), cert. denied, 435 U. S. 908 (1978). The court there stated: "The words 'heinous, cruel or depraved' have meanings that are clear to a person of average intelligence and understanding." 114 Ariz., at 543, 562 P. 2d, at 716. The court then offered definitions culled from Webster's Third New International Dictionary: "heinous" was defined as "hatefully or shockingly evil: grossly bad"; "cruel" as "disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic"; and "depraved" as "marked by debasement, corruption, perversion or deterioration." *Ibid.*[16] The court explained: "What our

---

[15] The majority relies on our holding in *Pulley* v. *Harris*, 465 U. S. 37, 43 (1984), in arguing that proportionality review is not constitutionally required. *Ante*, at 655–656. That reliance is misplaced. In *Pulley* the Court held that, so long as *other* safeguards at the initial sentencing proceeding adequately limit the sentencer's discretion, the Constitution does not require the additional protection of proportionality review by an appellate court. See 465 U. S., at 44–54. *Pulley* is simply irrelevant when the adequacy of the initial sentencing is itself the point at issue.

[16] These definitions are strikingly similar to the jury instructions given in *Maynard*, in which the Oklahoma jury was told that "the term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others." *Cartwright* v. *Maynard*, 822 F. 2d 1477, 1488 (CA10 1987). The majority acknowledges, albeit obliquely, that those instructions were unconstitutionally vague. See *ante*, at 652–653. The Tenth Circuit's assessment of the Oklahoma jury instructions is equally applicable to the definitions used in *Knapp*: "Vague terms do not suddenly become clear when they are de-

legislature intended to include as an aggravating circumstance was a killing wherein additional circumstances of the nature enumerated above set the crime apart from the usual or the norm." *Ibid.*

In *State v. Gretzler*, 135 Ariz. 42, 659 P. 2d 1, cert. denied, 461 U. S. 971 (1983), the Arizona Supreme Court reviewed its prior decisions construing the (F)(6) factor. The court explained that "cruelty involves the pain and distress visited upon the victims, and that heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." 135 Ariz., at 51, 659 P. 2d, at 10.[17] The court also listed five factors that, in prior cases, had supported a finding that a particular killing was especially heinous or depraved. These factors were (1) "the apparent relishing of the murder by the killer," (2) "the infliction of gratuitous violence on the victim," (3) "the needless mutilation of the victim," (4) "the senselessness of the crime," and (5) "the helplessness of the victim." *Id.*, at 52, 659 P. 2d, at 11. The court did not disavow the *Knapp* definitions; to the contrary, it cited those definitions with approval. 135 Ariz., at 51, 659 P. 2d, at 10. Nor did the court hold that a murder could be deemed especially heinous or depraved *only* when one of these five factors was present. Rather, the court stated: "Where no circumstances, *such as the specific factors discussed above*, separate the crime from the 'norm' of first degree murders, we will reverse a finding that the crime was committed in an 'especially heinous, cruel, or depraved manner.'" *Id.*, at 53, 659 P. 2d, at 12 (emphasis added).

The principles announced in *Gretzler* have failed to place meaningful limitations on the application of the (F)(6) ag-

---

fined by reference to other vague terms." *Cartwright v. Maynard*, 822 F. 2d, at 1489.

[17] The court also noted that "our concept of cruelty involves not only physical pain, but also 'mental . . . distress visited upon the victims.'" 135 Ariz., at 51, 659 P. 2d, at 10, quoting *State v. Clark*, 126 Ariz. 428, 436, 616 P. 2d 888, 896, cert. denied, 449 U. S. 1067 (1980).

gravating circumstance. Since its decision in *Gretzler*, the Arizona Supreme Court has continued to identify new factors which support a finding that a particular murder was heinous or depraved. The court, for example, has held that heinousness or depravity was shown in part by the age of the victim, see *State* v. *Wallace*, 151 Ariz., at 368, 728 P. 2d, at 238 ("[T]he fact that defendant killed two children, with whom he admittedly had no dispute and who posed no danger to him, is additional evidence of his 'shockingly evil state of mind'"); *State* v. *Zaragoza*, 135 Ariz. 63, 69, 659 P. 2d 22, 28 ("The victim in this case was 78 years old"), cert. denied, 462 U. S. 1124 (1983); by the fact the murder was committed to eliminate a witness, see *State* v. *Correll*, 148 Ariz. 468, 481, 715 P. 2d 721, 734 (1986); *State* v. *Gillies*, 142 Ariz. 564, 570, 691 P. 2d 655, 661 (1984), cert. denied, 470 U. S. 1059 (1985); *State* v. *Smith*, 141 Ariz. 510, 511–512, 687 P. 2d 1265, 1266–1267 (1984); by the fact the victim had been kind to the killer, *State* v. *Fisher*, 141 Ariz. 227, 252, 686 P. 2d 750, 775, cert. denied, 469 U. S. 1066 (1984); by the fact the killer used "special bullets . . . designed to inflict greater tissue damage," *State* v. *Rossi*, 146 Ariz., at 365, 706 P. 2d, at 377, or "intentionally and repeatedly fir[ed] a high-powered, destructive weapon at the victim," *State* v. *Chaney*, 141 Ariz. 295, 313, 686 P. 2d 1265, 1283 (1984); by the fact "the victim was bound to an extent far greater than was necessary to achieve" the purpose of preventing her escape, *State* v. *Villafuerte*, 142 Ariz. 323, 331, 690 P. 2d 42, 50 (1984), cert. denied, 469 U. S. 1230 (1985); or by the killer's "total disregard for human life," *State* v. *Correll*, 148 Ariz., at 481, 715 P. 2d, at 734. The Arizona Supreme Court has not purported to announce necessary conditions for a finding of heinousness or depravity. Instead, the court has observed: "Our previous cases have approved findings of heinous or depraved conduct where the perpetrator acted with gratuitous violence, relished the killing *or in some other way* acted in such a fashion that his acts set him apart from the 'norm' of first degree murderers."

*State* v. *Johnson*, 147 Ariz. 395, 401, 710 P. 2d 1050, 1056 (1985) (emphasis added).

Indeed, there would appear to be few first-degree murders which the Arizona Supreme Court would *not* define as especially heinous or depraved—and those murders which *do* fall outside this aggravating circumstance are likely to be covered by some other aggravating factor. Thus, the court will find heinousness and depravity on the basis of "gratuitous violence" if the murderer uses more force than necessary to kill the victim, see *State* v. *Summerlin*, 138 Ariz. 426, 436, 675 P. 2d 686, 696 (1983); *State* v. *Ceja*, 126 Ariz. 35, 40, 612 P. 2d 491, 496 (1980), but the murder will be deemed cruel if the killer uses insufficient force and the victim consequently dies a lingering death, see *State* v. *Chaney*, 141 Ariz., at 312, 686 P. 2d, at 1282. A determination that a particular murder is "senseless" will support a finding of depravity; but a murder to eliminate a witness is also depraved, a murder for pecuniary gain is covered by a separate aggravating circumstance,[18] and evidence showing that the defendant killed out of hatred for the victim or a desire for revenge may be used to buttress the court's conclusion that the killer "relished" the crime.

---

[18] See Ariz. Rev. Stat. Ann. § 13–703(F)(5) (1989). Indeed, the Arizona Supreme Court has been willing to find that a particular murder was committed *both* for an unworthy purpose and for no purpose at all. In *State* v. *Tison*, 129 Ariz. 526, 633 P. 2d 335 (1981), cert. denied, 459 U. S. 882 (1982), the Arizona Supreme Court found two aggravating circumstances: (1) the murders were committed for pecuniary gain, since the object of the killings was to obtain an automobile, *id.*, at 542, 633 P. 2d, at 351, and (2) the murders were senseless, and therefore especially heinous and depraved, in part because the victims could not have impeded the theft of the car and the killings therefore did not further the defendants' plan, *id.*, at 543, 633 P. 2d, at 352. See also *State* v. *Correll*, 148 Ariz. 468, 479, 715 P. 2d 721, 732 (1986) (pecuniary gain circumstance was established by the fact that the defendant and an accomplice "very carefully executed the armed robbery, and the murders were part of the scheme of robbery"); *id.*, at 481, 715 P. 2d, at 734 ((F)(6) factor was proved because "depravity is indicated by the senselessness of the murders in that the murders were unnecessary to accomplish the robbery").

See *State* v. *Jeffers*, 135 Ariz. 404, 430, 661 P. 2d 1105, 1131, cert. denied, 464 U. S. 865 (1983).[19] In *State* v. *Wallace*, 151 Ariz., at 368, 728 P. 2d, at 238, the court's determination that the crime was "senseless" (and therefore heinous and depraved) was based in part on the fact that the defendant "steadfastly maintains there was no reason or justification for what he did"—this in a case where the defendant argued that his remorse for the crime constituted a mitigating factor.

I must also conclude that the Arizona Supreme Court's construction of "cruelty" has become so broad that it imposes no meaningful limits on the sentencer's discretion. The court in *State* v. *Knapp*, 114 Ariz., at 543, 562 P. 2d, at 716, used a dictionary definition to regard "'cruel'" as "'disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic.'" This might have provided the starting point for a limiting construction that would have meaningfully distinguished the most egregious murders. This Court in *Maynard* expressed apparent approval of a construction that would limit the aggravating circumstance to murders involving "torture or serious physical abuse." 486 U. S., at 364; accord, *Godfrey* v. *Georgia*, 446 U. S., at 431 (plurality opinion). And I have no quarrel with the proposition that a murder which is preceded by the deliberate infliction of gratuitous suffering is more blameworthy than one which is not.

---

[19]The Arizona Supreme Court has identified other particularly reprehensible motives which, in its view, will support a finding of heinousness or depravity. See *State* v. *Martinez-Villareal*, 145 Ariz. 441, 451, 702 P. 2d 670, 680 (murder to demonstrate "manliness" reflects "a manifest disregard for the fundamental principles upon which our society is based"), cert. denied, 474 U. S. 975 (1985); *State* v. *McCall*, 139 Ariz. 147, 162, 677 P. 2d 920, 935 (1983) (finding supported in part by the fact that the mutilation of the victims' bodies "was designed to be a 'message' to warn other people"), cert. denied, 467 U. S. 1220 (1984). Taken together, the state court's decisions reflect the indisputable fact that there is no legitimate reason to commit murder, but they provide no principled basis for identifying the most blameworthy killings.

The Arizona Supreme Court's later decisions, however, made it clear that the murder which is "especially cruel" is the norm rather than the exception. The application of this circumstance has been expanded to cover any murder in which the victim is shown to have experienced fear or uncertainty as to his ultimate fate.[20] The Arizona Supreme Court has not required that the defendant must have deliberately delayed or protracted the killing *for the purpose* of causing the victim mental anguish. Nor has the court required that the period of fear or uncertainty be of extended duration: The court has made findings of cruelty in cases where that period was brief.[21] Indeed, in explaining the sorts of murder that would *not* be especially cruel, the Arizona Supreme Court has repeatedly referred to killings in which the victim was not conscious, see, *e. g.*, *State* v. *Beaty*, 158 Ariz., at 242, 762 P. 2d, at 529 ("[T]o suffer pain or distress, the victim must be conscious at the time the offense is committed. If the evidence is inconclusive on consciousness, the factor of cruelty cannot exist"), cert. denied, 491 U. S. 910 (1989),[22] and has explained that the victim of an "especially cruel" killing is "to be contrasted with the individual who is killed instantly without knowing what happened." *State* v. *Gillies*, 142 Ariz. 564, 570, 691 P. 2d 655, 661 (1984), cert. denied, 470 U. S. 1059 (1985). I do not believe that an aggravating factor

---

[20] See, *e. g.*, *State* v. *Bracy*, 145 Ariz. 520, 537, 703 P. 2d 464, 481 (1985), cert. denied, 474 U. S. 1110 (1986); *State* v. *Carriger*, 143 Ariz. 142, 160, 692 P. 2d 991, 1009 (1984), cert. denied, 471 U. S. 1111 (1985); *State* v. *Correll*, 148 Ariz., at 480, 715 P. 2d, at 733.

[21] See *State* v. *Rossi*, 146 Ariz., at 365, 706 P. 2d, at 377 ("Before defendant fired the fatal shot, the victim leaned against his bedroom wall and pleaded with defendant, stating 'You have my money, you shot me, what more do you want?' This evinces the victim's mental anguish").

[22] See also *State* v. *Villafuerte*, 142 Ariz. 323, 331, 690 P. 2d 42, 50 (1984), cert. denied, 469 U. S. 1230 (1985); *State* v. *Harding*, 137 Ariz. 278, 294, 670 P. 2d 383, 399 (1983), cert. denied, 465 U. S. 1013 (1984); *State* v. Zaragoza, 135 Ariz. 63, 69, 659 P. 2d 22, 28, cert. denied, 462 U. S. 1124 (1983).

which requires only that the victim be conscious and aware of his danger for some measurable period before the killing occurs can be said to provide a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey* v. *Georgia*, 446 U. S., at 433 (plurality opinion). And I am entirely baffled by the majority's assertion that this construction of the aggravating circumstance is "virtually identical," *ante*, at 655, to a requirement of torture or serious physical abuse.[23]

The majority is correct in asserting that, in the absence of evidence to the contrary, the trial judge who sentenced petitioner to death must be presumed to have been aware of the manner in which these statutory terms had been construed by the Arizona Supreme Court. That judge's familiarity with the applicable precedents, however, could not possibly have served to guide or channel his sentencing discretion. The entire body of Arizona case law, like the bare words of the statute, provided "no principled way to distinguish this case" from other homicides where capital sentences were not imposed. Under this Court's decisions in *Godfrey* and *Maynard*, the standards by which the trial court sentenced Walton to death were constitutionally deficient.

B

Relying on *Clemons* v. *Mississippi*, 494 U. S. 738 (1990), the majority also contends that "a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined . . . .

---

[23] The State, focusing on the fear and uncertainty experienced by Powell prior to the shooting, asserts: "It is without question that the victim suffered an excruciatingly 'cruel' death," and suggests that Powell's mental anguish was equivalent to "torture." Brief for Respondent 48–49. I do not minimize Thomas Powell's suffering, but it bears noting that the State of Arizona seeks to confine Jeffrey Walton in its penitentiary, set a date for his execution, and put him to death. It seems strange for the State to suggest that an individual has been "tortured" when he is made to contemplate the prospect of his own demise.

[T]he Arizona Supreme Court has sought to give substance to the operative terms, and we find that its construction meets constitutional requirements." *Ante,* at 654. The Court thus holds that, even if the trial-level sentencing procedure failed to satisfy the Eighth Amendment, Walton's sentence nevertheless may stand because the appellate court, applying a satisfactory limiting construction, independently determined that the murder was especially cruel. For three independent reasons, I cannot accept that conclusion.

(1) If the (F)(6) factor and the prior decisions of the Arizona Supreme Court failed to provide sufficient guidance to the trial judge, the appellate court's conclusion that this murder fell within some narrow definition of "cruel" could not eliminate the possibility that the trial court, in balancing aggravating and mitigating circumstances, had relied on factors lying outside this narrow definition. Affirmance of Walton's death sentence depends not only on the Arizona Supreme Court's determination that this murder was especially cruel, but also upon its conclusion that the mitigating factors did not outweigh those in aggravation. I adhere to the view, expressed in the separate opinion in *Clemons,* 494 U. S., at 756, which three other Justices joined, that an appellate court is incapable of finding and balancing aggravating and mitigating factors in a manner that is sufficiently reliable to satisfy the Eighth Amendment.[24] Indeed, the Arizona Supreme Court's treatment of the record in this case hardly provides support for those Members of this Court—a bare majority—who now would entrust the task of capital sentencing to an appellate tribunal. The state court's conclusion that the murder was especially cruel was based in large part

---

[24] The discussion of appellate reweighing in *Clemons* technically is dictum: The Court vacated Clemons' death sentence but stated that on remand the Mississippi Supreme Court might reweigh the valid aggravating and mitigating circumstances or apply a limiting construction of the challenged aggravating factor if it concluded that under state law it had the power to do so. 494 U. S., at 750–752.

on its assertions that Powell "was so clearly terrified by the time they stopped that [one of the assailants] tried to reassure him that they would not hurt him" and that during the final march into the desert the victim "begged the defendant not to kill him." 159 Ariz., at 587, 769 P. 2d, at 1033. The court's discussion includes no citations to the record (which furnishes frail support for the court's characterization of the events), and appears to be based primarily on a misreading of the State's appellate brief.[25] Given the institutional limitations of appellate courts generally, and the questionable treatment of the facts by the Arizona Supreme Court in this case, I cannot agree that the appellate sentencing here was sufficiently reliable to meet the standards of the Eighth Amendment.[26]

---

[25] The Arizona Supreme Court's first assertion is supported only by the following passage from the testimony of Sharold Ramsey:

"Q. How was [Powell] acting after you pulled up at the pullout and they got out of the car?

"A. He was scared.

"Q. How do you know?

"A. I don't remember. I just told him not to be scared because he wouldn't be hurt. . . ." App. 24.

The statement that Powell "begged the defendant not to kill him" appears to be based entirely on Walton's statement during his taped interrogation that "the guy told Rob [one of Walton's accomplices], he goes, don't hurt me, I don't tell anybody, ((inaudible))." Tr. 82 (Dec. 15, 1986, p.m.).

In its brief to the Arizona Supreme Court, the State asserted, without record citation: "During the ride, Powell begged his abductors to spare him and they could keep his money and car." Appellee's Answering Brief in No. CR 87–0022–AP, p. 50. That assertion was made more or less in passing: the State's argument on cruelty focused on Powell's mental and physical suffering *after* the shooting. The Arizona Supreme Court's opinion asserts that Powell begged for his life when he and Walton were alone in the desert (rather than during the car ride beforehand). There is not one line of testimony that supports the court's statement.

[26] The trial judge in this case found that Walton rather than Hoover had fired the fatal shot—an issue on which the evidence was conflicting and on which the jury was apparently unable to agree. See 159 Ariz., at 592–593, 769 P. 2d, at 1038–1039 (concurring opinion). In its brief to the Arizona

(2) In *Clemons*, this Court stated that, insofar as the Federal Constitution is concerned, a state appellate court may determine for itself whether a capital sentence is warranted when the trial-level sentencing proceeding has been tainted by constitutional error. Whether the supreme court of a particular State possesses that power, however, is a matter of state law.[27] The Arizona Supreme Court has taken obviously inconsistent positions on the question whether trial-level error in capital sentencing necessitates a remand, or whether the error may be cured by the appellate court's independent review. Compare *State* v. *Wallace*, 151 Ariz., at 369, 728 P. 2d, at 239 ("As we have set aside the finding of pecuniary gain, we must now allow the trial court another opportunity to exercise its sentencing discretion and reweigh the remaining aggravating and mitigating factors"); *State* v. *Rossi*, 146 Ariz., at 368, 706 P. 2d, at 380 ("Because we believe the trial judge used the wrong standard for determining and applying mitigating factors, we must vacate defendant's death sentence and remand for resentencing"); *State* v. *McMurtrey*, 143 Ariz. 71, 73, 691 P. 2d 1099, 1101 (1984) ("Because the trial judge imposed upon the defendant a more onerous burden of proof in determining the existence of mitigating circumstances, the matter will have to be remanded for resentencing"); *State* v. *Gillies*, 135 Ariz. 500, 516, 662 P.

---

Supreme Court, the State argued that this finding should be reviewed deferentially on the ground that "[a]s the trial court is better situated to assess the impact of the evidence, its decision should not be overturned absent abuse of that discretion." Appellee's Answering Brief in No. 87–0022–AP, p. 48. The Arizona Supreme Court did not purport to make an independent determination on this point: It stated only that "we find substantial evidence to support the trial judge's finding that the defendant killed the victim." 159 Ariz., at 586, 769 P. 2d, at 1032.

[27] See *Clemons*, 494 U. S., at 754 ("Nothing in this opinion is intended to convey the impression that state appellate courts are required to or necessarily should engage in reweighing or harmless error analysis when errors have occurred in a capital sentencing proceeding. Our holding is only that such procedures are constitutionally permissible").

2d 1007, 1023 (1983) (court remanded for resentencing after three of four aggravating circumstances found by the trial judge were invalidated on appeal), with *State* v. *Rockwell*, 161 Ariz. 5, 15–16, 775 P. 2d 1069, 1079–1080 (1989) (court invalidated two of three aggravating circumstances and concluded that the mitigating evidence outweighed the remaining aggravating factor); *State* v. *Poland*, 144 Ariz. 388, 407, 698 P. 2d 183, 202 (1985) ("The finding that the murders were committed in an 'especially heinous, cruel or depraved manner' is set aside, but the findings as to the other aggravating circumstances are affirmed. No mitigating circumstances sufficiently substantial to call for leniency have been shown"); *State* v. *James*, 141 Ariz. 141, 148, 685 P. 2d 1293, 1300 (court struck down one aggravating factor but upheld the death sentence on the ground that "[t]here is [another] aggravating circumstance and no mitigating circumstances sufficiently substantial to call for leniency"), cert. denied, 469 U. S. 990 (1984); *State* v. *Blazak*, 131 Ariz. 598, 604, 643 P. 2d 694, 700 (one aggravating factor invalidated, but death sentence upheld because "[e]ven in the absence of this aggravating circumstance, there are still enough aggravating circumstances that cannot be overcome by the mitigating circumstances"), cert. denied, 459 U. S. 882 (1982).[28] It simply is not clear whether the Arizona Supreme Court regards itself as having the power to uphold a capital sentence on the basis of its own comparison of aggravating and mitigating circumstances when the sentencing judge has relied in part upon an invalid aggravating factor.

In this case, as in all capital cases, the Arizona Supreme Court performed an "independent review" of the trial-level

---

[28] See also *State* v. *Smith*, 146 Ariz. 491, 504, 707 P. 2d 289, 302 (1985) ("Our elimination of some aggravating factors *in the absence of mitigating circumstances* does not mandate a remand to the trial court for resentencing") (emphasis added) (citing cases). Where mitigating factors are absent, affirmance of the death sentence does not require reweighing and is more properly characterized as harmless-error analysis.

sentencing process. The Arizona Supreme Court consistently has maintained: "Unlike appellate review of non-capital crimes, our duty on review of the death penalty is to conduct an independent examination of the record to determine whether the death penalty was properly imposed." *State* v. *Schad*, 129 Ariz. 557, 573, 633 P. 2d 366, 382 (1981), cert. denied, 455 U. S. 983 (1982). The independent review performed by the Arizona Supreme Court in capital cases, however, is quite different from appellate "reweighing" as that term is used in *Clemons*. The Arizona court's review does not proceed from the premise that errors in the trial-level sentencing process can be cured by the State Supreme Court's determination that death is the appropriate penalty. Rather, that review historically has been explained as an additional level of protection for the defendant, a means of ensuring that a trial judge's sentence of death is subjected to rigorous scrutiny. See *State* v. *Richmond*, 114 Ariz. 186, 196, 560 P. 2d 41, 51 (1976) ("The gravity of the death penalty requires that we painstakingly examine the record to determine whether it has been erroneously imposed"), cert. denied, 433 U. S. 915 (1977). Under Arizona law, the trial court is the sentencer, and the appellate court's review is intended to ensure that trial-level functions were properly carried out. Indeed, the Arizona Supreme Court has resisted analogies between its own independent review and the initial trial-level sentencing process: "While we have an independent duty of review, we perform it as an appellate court, not as a trial court. . . . We hold, therefore, that the Arizona procedure is not a single indivisible hearing, but instead resembles a trial on the issue of life or death followed by the utilization of this court's appellate process . . . ." *State* v. *Rumsey*, 136 Ariz. 166, 173, 665 P. 2d 48, 55 (1983).[29] To-

---

[29] In affirming the judgment of the Arizona Supreme Court in that case, this Court stated that "the availability of appellate review, including reweighing of aggravating and mitigating circumstances, [does not] make the appellate process part of a single continuing sentencing proceeding. The

day's majority indicates, however, that the Arizona Supreme Court's independent review may serve as a *substitute* for a constitutionally adequate trial-level sentencing proceeding, despite the fact that the State Supreme Court did not believe that any trial-level error had occurred and regarded itself as *affirming* the sentencing decision of the lower court.

Whether or not the Arizona Supreme Court possesses the power to "reweigh" evidence in order to cure trial-level error, it is clear that the court did not purport to exercise that power in this case. The court did not suggest that the trial judge's finding of the (F)(6) circumstance was constitutionally suspect. The Arizona Supreme Court made independent determinations as to aggravating and mitigating circumstances, but these findings were plainly intended to *supplement* rather than to replace the findings of the trial court. That this is a distinction with a difference should be clear to the present majority from this Court's opinion in *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985). In *Caldwell* we invalidated a capital sentence imposed by a jury which had been incorrectly informed that its verdict was only a "recommendation." We stated that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.*, at 328–329. The same reasoning should apply here. Just as a jury's sentence of death may not stand if the jury believed that it was merely *recommending* capital punishment, the Arizona Supreme Court's independent determination that death is appropriate cannot cure trial-level error if the appellate court believed in-

---

Supreme Court of Arizona noted that its role is strictly that of an appellate court, not a trial court. Indeed, no appeal need be taken if life imprisonment is imposed, *and the appellate reweighing can work only to the defendant's advantage.*" *Arizona* v. *Rumsey*, 467 U. S. 203, 210 (1984) (emphasis added). We also referred to the trial judge as "the sole decisionmaker in the proceeding." *Id.*, at 211.

correctly that it was simply *affirming* a constitutionally valid sentence imposed by the trial judge.

Thus, even if I could accept the majority's conclusion that appellate resentencing can cure constitutional defects in the trial-level procedure, I could not agree that the Arizona Supreme Court has purported to exercise that power here. To conclude that Walton's death sentence may stand, despite constitutional defects in the trial-level sentencing process, it is not enough for the majority to say that the Constitution permits a state appellate court to reweigh valid aggravating and mitigating factors. The majority must also be prepared to assert with reasonable assurance that the Arizona Supreme Court would have chosen to affirm the death sentence on the basis of its own reweighing if it had recognized that the trial-level procedure was defective. Given the Arizona court's inconsistent treatment of the reweighing issue, no such assertion is possible. In holding that the appellate court's independent review can save the sentence even if the trial judge received insufficient guidance, the majority affirms a decision that the Arizona Supreme Court never made.

(3) Even if I believed that appellate resentencing could cure trial-level error, and that the Arizona Supreme Court can properly be regarded as the sentencer in this case, I would still conclude that petitioner's sentence must be vacated. The (F)(6) aggravating factor, as construed by the State Supreme Court, sweeps so broadly that it includes within its reach virtually every homicide. The appellate court's application of the statutory language simply provides no meaningful basis on which a defendant such as Walton can be singled out for death.

Indeed, my conclusion that the sentence imposed by the appellate court is invalid follows almost necessarily from my belief that the trial-level sentencing was constitutionally flawed.[30] The defective nature of the trial court's sentence

---

[30] The one difference is that the trial judge found only that the murder was committed "in an extremely heinous, cruel or depraved manner,"

did not stem from the judge's failure to abide by limitations announced by the Arizona Supreme Court. Rather, the trial-level sentencing procedure was defective because, even assuming that the trial judge correctly applied the relevant precedents, those decisions had failed to articulate a constitutionally sufficient narrowing construction of the statutory language. In the two years between the trial court's imposition of sentence and its own affirmance, the Arizona Supreme Court did not purport to narrow the scope of the (F)(6) aggravating factor. It therefore is difficult to see how any trial-level error could have been cured by the appellate court's application of the *same* legal rules that the trial judge is presumed to have followed.

The majority concedes, as it must, that the statutory language is unconstitutionally vague under *Godfrey* and *Maynard*. The majority therefore recognizes that the validity of the (F)(6) factor depends upon the construction given it by the Arizona Supreme Court. I do not see how the adequacy of that construction can be determined other than through examination of the body of state-court precedents — an examination that the majority conspicuously declines to undertake. Because the Arizona Supreme Court has utterly failed to place meaningful limits on the application of this aggravating factor, a sentence based in part upon the (F)(6) circumstance should not stand.[31]

---

while the appellate court specified that the murder was "cruel." If the Arizona Supreme Court's prior decisions had placed meaningful limits on the concept of "cruelty," that difference might be significant. In fact, however, the state court's construction of "cruelty" has placed no significant constraints on the sentencer's discretion—whether the sentencer is the trial judge or the Arizona Supreme Court itself.

[31] The breadth of the (F)(6) circumstance is particularly unfortunate in light of the statutory requirement that the defendant, in order to avoid the death penalty, must demonstrate mitigating factors "sufficiently substantial to call for leniency." The presumption of death is triggered whenever an aggravating circumstance is found; the Arizona Supreme Court's expan-

## III

Earlier this Term the very same majority of this Court severely restricted the regime of federal habeas corpus that had previously helped to safeguard the constitutional rights of criminal defendants, including those accused of capital crimes. See *Butler* v. *McKellar*, 494 U. S. 407 (1990); *Saffle* v. *Parks*, 494 U. S. 484 (1990). Today this majority serves notice that capital defendants no longer should expect from this Court on direct review a considered examination of their constitutional claims. In adjudicating claims that will mean life or death for convicted inmates in Arizona and elsewhere, the majority makes only the most perfunctory effort to reconcile its holding with this Court's prior Eighth Amendment jurisprudence. Nor does the majority display any recognition that a decision concerning the constitutionality of a State's capital punishment scheme may require an understanding of the manner in which that scheme actually operates.

Perhaps the current majority has grown weary of explicating what some Members no doubt choose to regard as hypertechnical rules that currently govern the administration of the death penalty. Certainly it is to be hoped that States will scrupulously protect the constitutional rights of capital defendants even without the prospect of meaningful federal oversight. Good wishes, however, are no substitute for this Court's careful review. Today's decision is either an abdication of the Court's constitutional role, or it is a silent repudiation of previously settled legal principles.

I dissent.

JUSTICE STEVENS, dissenting.

While I join JUSTICE BLACKMUN's dissent, I write separately to dissent from the Court's holding in Part II and to comment on JUSTICE SCALIA's opinion.

---

sive construction of the (F)(6) factor ensures that an aggravating circumstance plausibly can be discovered in virtually any murder.

## I

The Court holds in Part II of its opinion that a person is not entitled to a jury determination of facts that must be established before the death penalty may be imposed. I am convinced that the Sixth Amendment requires the opposite conclusion.

Arizona Rev. Stat. Ann. § 13–1105(C) (1989) provides that first-degree murder, which includes both premeditated murder and felony murder, is "punishable by death or life imprisonment as provided by § 13–703." Section 13–703(B) requires, after guilt of first-degree murder is established, that a judge conduct a hearing to determine if any statutory aggravating or mitigating circumstances exist. The State bears the burden of proving the existence of any aggravating circumstance by evidence admissible under the Arizona Rules of Evidence. § 13–703(C). Section 13–703(E) then provides, as the Arizona Supreme Court has explained: "Where none of the statutory aggravating circumstances are found to be present, our statute prohibits the death penalty. Where one or more statutory aggravating circumstance is found, and no mitigation exists, the statute requires the death penalty. Where both aggravating and mitigating circumstances are found in a given case, the trial judge, and then this court on review, must determine whether the mitigating circumstances are 'sufficiently substantial to call for leniency.'" *State* v. *Gretzler*, 135 Ariz. 42, 55, 659 P. 2d 1, 13 (citations omitted), cert. denied, 461 U. S. 971 (1983). Thus, under Arizona law, as construed by Arizona's highest court, a first-degree murder is not punishable by a death sentence until at least one statutory aggravating circumstance has been proved.[1]

---

[1] Although Arizona's aggravating circumstances are not "separate penalties or offenses," *Poland* v. *Arizona*, 476 U. S. 147, 156 (1986) (double jeopardy challenge), they operate as statutory "elements" of capital murder under Arizona law because in their absence, that sentence is unavailable under §§ 13–1105 and 13–703. Cf. *McMillan* v. *Pennsylvania*, 477

In this case, the sentencing judge found two aggravating circumstances: that petitioner committed the offense "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value" and that he committed it "in an especially heinous, cruel or depraved manner." Ariz. Rev. Stat. Ann. §§ 13–703(F)(5), (F)(6) (1989).[2] At issue is the narrow question whether these findings about petitioner's commission of the offense are, under Arizona law, elements of a capital crime and therefore must be determined by a jury.

If this question had been posed in 1791, when the Sixth Amendment became law, the answer would have been clear. By that time,

> "the English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the

U. S. 79, 88 (1986) (5-year minimum term required upon finding by sentencing court was "a penalty within the range already available to it without the special finding"); *Cabana* v. *Bullock*, 474 U. S. 376, 385 (1986) (requiring a finding of intent to comply with the Eighth Amendment does not establish any new element of the *State's definition* of a capital offense).

[2] This Court has long distinguished a jury's determination of "whether a defendant is guilty of having engaged in certain criminal conduct" from a sentencing judge's consideration of "the fullest information possible concerning the defendant's life and characteristics." *Williams* v. *New York*, 337 U. S. 241, 246–247 (1949). Both of the aggravating circumstances in this case concern the offense itself, not the offender. Indeed, the Arizona courts' findings of aggravation rested entirely on evidence that had been presented to the jury during the guilt phase of the trial; the Arizona Supreme Court disregarded the only testimony about aggravation offered at the sentencing hearing as irrelevant. Tr. (Jan. 26–27, 1987); 159 Ariz. 571, 587, 769 P. 2d 1017, 1033 (1989) (testimony about victim *after* shooting did not bear on cruelty). Cf. *Spaziano* v. *Florida*, 468 U. S. 447, 452 (1984) (after a Florida jury recommended life, sentencing judge found defendant's felony record was an aggravating factor); *Hildwin* v. *Florida*, 490 U. S. 638, 639 (1989) *(per curiam)* (after a Florida jury recommended death, sentencing judge found defendant's felony record and status as a prisoner at the time of the crime were aggravating factors).

offense. Moreover, *the jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well established.* Throughout its history, the jury determined which homicide defendants would be subject to capital punishment by making factual determinations, many of which related to difficult assessments of the defendant's state of mind. By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned."[3]

Similarly, if this question had arisen in 1968, when this Court held the guarantee of trial by jury in criminal prosecutions binding on the States, I do not doubt that petitioner again would have prevailed. JUSTICE WHITE's eloquent opinion for the Court in *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), was faithful to the history and meaning of the Sixth Amendment:

"The history of trial by jury in criminal cases has been frequently told. It is sufficient for present purposes to say that by the time our Constitution was written, jury trial in criminal cases had been in existence in England for several centuries and carried impressive credentials traced by many to Magna Carta. Its preservation and proper operation as a protection against arbitrary rule were among the major objectives of the revolutionary settlement which was expressed in the Declaration and

---

[3] White, Fact-Finding and the Death Penalty: The Scope of a Capital Defendant's Right to Jury Trial, 65 Notre Dame L. Rev. 1, 10–11 (1989) (footnote omitted; emphasis added). The right to a jury trial in criminal matters was most strongly guarded because " 'in times of difficulty and danger, more is to be apprehended from the violence and partiality of judges appointed by the Crown, in suits between the king and the subject, than in disputes between one individual and another.' " *Id.,* at 10 (quoting 4 W. Blackstone, Commentaries 343 (1769)). For a view of earlier practices, see generally Green, The Jury and the English Law of Homicide, 1200–1600, 74 Mich. L. Rev. 413 (1976).

Bill of Rights of 1689. In the 18th century Blackstone could write:

"'Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. It was necessary, for preserving the admirable balance of our constitution, to vest the executive power of the laws in the prince: and yet this power might be dangerous and destructive to that very constitution, if exerted without check or control, by justices of *oyer* and *terminer* occasionally named by the crown; who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English law have, with excellent forecast, contrived that . . . the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion.'

"Jury trial came to America with English colonists, and received strong support from them.

.        .        .        .        .

"The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Pro-

viding an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Id.*, at 151–152, 155–156 (footnotes omitted).

Since *Duncan,* this Court has held that a death sentence under Florida law may be imposed by a judge, rather than a jury, *Spaziano* v. *Florida,* 468 U. S. 447 (1984), and has held that a judge may make a factual determination that mandates imposition of a minimum sentence within the penalty range of certain noncapital offenses, *McMillan* v. *Pennsylvania,* 477 U. S. 79 (1986). By stretching the limits of sentencing determinations that are made by judges exposed to "the voice of higher authority," these decisions have encroached upon the factfinding function that has so long been entrusted to the jury.[4] Further distorting the sentencing function to

---

[4] *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968). Although the 18th-century English ruler no longer bears upon our judges, today the "voice of higher authority" to which elected judges too often appear to listen is that of the many voters who generally favor capital punishment but who have far less information about a particular trial than the jurors who have sifted patiently through the details of the relevant and admissible evidence. How else do we account for the disturbing propensity of elected judges to impose the death sentence time after time notwithstanding a jury's recommendation of life? I have been advised that in Florida, where the jury provides an advisory sentence before the judge imposes sentence in a capital case, Fla. Stat. § 921.141 (1989), judges imposed death over a jury recommendation of life in 125 of the 617 death sentences entered between December 1972 and December 1989. See also Radelet, Rejecting

encompass findings of factual elements necessary to establish a capital offense is the unhappy product of the gradual "increase and spread" of these precedents, "to the utter disuse of juries in questions of the most momentous concern."[5] Even if the unfortunate decisions in *Spaziano* and *McMillan* fell just one step short of the stride the Court takes today, it is not too late to change our course and follow the wise and inspiring voice that spoke for the Court in *Duncan* v. *Louisiana.*

## II

JUSTICE SCALIA announces in a separate opinion that henceforth he will not regard *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), *Roberts* v. *Louisiana,* 428 U. S. 325 (1976), *Lockett* v. *Ohio,* 438 U. S. 586 (1978), *Godfrey* v. *Georgia,* 446 U. S. 420 (1980), and other cases adopting their reasoning as binding precedent. The major premise for this rejection of our capital sentencing jurisprudence is his professed inability to reconcile those cases with the central holding in *Furman* v. *Georgia,* 408 U. S. 238 (1972).[6] Although

---

the Jury: The Imposition of the Death Penalty in Florida, 18 U. C. D. L. Rev. 1409 (1985) (judges are more likely than juries to favor the imposition of a death sentence).

[5] "So that the liberties of England cannot but subsist, so long as this *palladium* remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make) but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and courts of conscience. And however *convenient* these may appear at first, (as doubtless all arbitrary powers, well executed, are the most *convenient*) yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern." 4 W. Blackstone, Commentaries 343–344 (1769).

[6] *Furman* has been characterized as mandating that "where discretion is afforded a sentencing body on a matter so grave as the determination of

there are other flaws in JUSTICE SCALIA's opinion,[7] it is at least appropriate to explain why his major premise is simply wrong.

The cases that JUSTICE SCALIA categorically rejects today rest on the theory that the risk of arbitrariness condemned in *Furman* is a function of the size of the class of convicted persons who are eligible for the death penalty. When *Furman* was decided, Georgia included virtually all defendants convicted of forcible rape, armed robbery, kidnaping, and first-degree murder in that class. As the opinions in *Furman* observed, in that large class of cases race and other irrelevant factors unquestionably played an unacceptable role in determining which defendants would die and which would live.

---

whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg* v. *Georgia*, 428 U. S. 153, 189 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.).

[7] For example, JUSTICE SCALIA incorrectly assumes that our holdings in *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), and *Roberts* v. *Louisiana*, 428 U. S. 325 (1976), rest entirely on the view that mandatory death penalty statutes pose the same risk of arbitrariness that supported the Court's decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972). See *ante*, at 671–672. In fact, that consideration was only one of the three grounds for invalidating the North Carolina and Louisiana mandatory statutes. See *Woodson*, 428 U. S., at 288–305 (plurality opinion). JUSTICE SCALIA ironically overlooks a more traditional reason supporting our conclusion in *Woodson*, the growing societal consensus against mandatory imposition of the death penalty:

"The history of mandatory death penalty statutes in the United States thus reveals that the practice of sentencing to death all persons convicted of a particular offense has been rejected as unduly harsh and unworkably rigid. The two crucial indicators of evolving standards of decency respecting the imposition of punishment in our society—jury determinations and legislative enactments—both point conclusively to the repudiation of automatic death sentences." *Id.*, at 292–293.

We further held that the "fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.*, at 304.

However, the size of the class may be narrowed to reduce sufficiently that risk of arbitrariness, even if a jury is then given complete discretion to show mercy when evaluating the individual characteristics of the few individuals who have been found death eligible.

The elaborate empirical study of the administration of Georgia's capital sentencing statute that the Court considered in *McCleskey* v. *Kemp*, 481 U. S. 279 (1987), further illustrates the validity of this theory. In my opinion in that case I observed:

> "One of the lessons of the Baldus study is that there exist certain categories of extremely serious crimes for which prosecutors consistently seek, and juries consistently impose, the death penalty without regard to the race of the victim or the race of the offender. If Georgia were to narrow the class of death-eligible defendants to those categories, the danger of arbitrary and discriminatory imposition of the death penalty would be significantly decreased, if not eradicated." *Id.,* at 367 (dissenting opinion).

The Georgia Supreme Court itself understood the concept that JUSTICE SCALIA apparently has missed. In *Zant* v. *Stephens,* 462 U. S. 862 (1983), we quoted the following excerpt from its opinion analogizing the law governing homicides in Georgia to a pyramid:

> " 'All cases of homicide of every category are contained within the pyramid. The consequences flowing to the perpetrator increase in severity as the cases proceed from the base of the apex, with the death penalty applying only to those few cases which are contained in the space just beneath the apex. To reach that category a case must pass through three planes of division between the base and the apex.
>
> " 'The first plane of division above the base separates from all homicide cases those which fall into the category

of murder. This plane is established by the legislature in statutes defining terms such as murder, voluntary manslaughter, involuntary manslaughter, and justifiable homicide. In deciding whether a given case falls above or below this plane, the function of the trier of facts is limited to finding facts. The plane remains fixed unless moved by legislative act.

"'The second plane separates from all murder cases those in which the penalty of death is a possible punishment. This plane is established by statutory definitions of aggravating circumstances. The function of the factfinder is again limited to making a determination of whether certain facts have been established. Except where there is treason or aircraft hijacking, a given case may not move above this second plane unless at least one statutory aggravating circumstance exists. Code Ann. § 27–2534.1(c).

"'The third plane separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed. There is an absolute discretion in the factfinder to place any given case below the plane and not impose death. The plane itself is established by the factfinder. In establishing the plane, the factfinder considers all evidence in extenuation, mitigation and aggravation of punishment. Code Ann. § 27–2503 and § 27–2534.1. There is a final limitation on the imposition of the death penalty resting in the automatic appeal procedure: This court determines whether the penalty of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the statutory aggravating circumstances are supported by the evidence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. Code Ann. § 27–2537. Performance of this function may cause this court to remove a case from the death penalty category but can never have the opposite result.

    " 'The purpose of the statutory aggravating circum-
stances is to limit to a large degree, but not completely,
the factfinder's discretion.   Unless at least one of the ten
statutory aggravating circumstances exists, the death
penalty may not be imposed in any event.   If there exists
at least one statutory aggravating circumstance, the
death penalty may be imposed but the factfinder has a
discretion to decline to do so without giving any reason.
*Waters* v. *State*, 248 Ga. 355, 369, 283 S. E. 2d 238 (1981);
*Hawes* v. *State*, 240 Ga. 327, 334, 240 S. E. 2d 833 (1977);
*Fleming* v. *State*, 240 Ga. 142, 240 S. E. 2d 37 (1977).   In
making the decision as to the penalty, the factfinder takes
into consideration all circumstances before it from both
the guilt-innocence and the sentence phases of the trial.
These circumstances relate both to the offense and the
defendant.

    " 'A case may not pass the second plane into that area
in which the death penalty is authorized unless at least
one statutory aggravating circumstance is found.   How-
ever, this plane is passed regardless of the number of
statutory aggravating circumstances found, so long as
there is at least one.   Once beyond this plane, the case
enters the area of the factfinder's discretion, in which all
the facts and circumstances of the case determine, in
terms of our metaphor, whether or not the case passes
the third plane and into the area in which the death pen-
alty is imposed.'   250 Ga. 97, 99–100, 297 S. E. 2d 1, 3–4
(1982)."   *Id.*, at 870–872.

JUSTICE SCALIA ignores the difference between the base of
the pyramid and its apex.   A rule that forbids unguided dis-
cretion at the base is completely consistent with one that re-
quires discretion at the apex.   After narrowing the class of
cases to those at the tip of the pyramid, it is then appropriate
to allow the sentencer discretion to show mercy based on in-
dividual mitigating circumstances in the cases that remain.

Perhaps a rule that allows the specific facts of particular cases to make the difference between life and death—a rule that is consistent with the common-law tradition of case-by-case adjudication—provides less certainty than legislative guidelines that mandate the death penalty whenever specified conditions are met. Such guidelines would fit nicely in a Napoleonic Code drafted in accord with the continental approach to the formulation of legal rules. However, this Nation's long experience with mandatory death sentences—a history recounted at length in our opinion in *Woodson* and entirely ignored by JUSTICE SCALIA today—has led us to reject such rules. I remain convinced that the approach adopted by this Court in *Weems* v. *United States*, 217 U. S. 349 (1910), and in *Trop* v. *Dulles*, 356 U. S. 86 (1958), followed by Justice Stewart, Justice Powell, and myself in 1976, and thereafter repeatedly endorsed by this Court, is not only wiser, but far more just, than the reactionary position espoused by JUSTICE SCALIA today.